Donald LAW, Plaintiff, Appellee,

v.

ERNST & YOUNG, etc., Defendant,
Appellant.

No. 91–1567.

United States Court of Appeals,
First Circuit.

Heard Oct. 9, 1991.

Decided Feb. 12, 1992.

Kathryn A. Oberly, Associate General Counsel, with whom Elizabeth B. Healy, Asst. General Counsel, George C. Shelling, and Gross, Minsky, Mogul & Singal were on brief, for defendant, appellant.

Alfred C. Frawley, with whom Brann & Isaacson was on brief, for plaintiff, appellee.

* Of the District of Massachusetts, sitting by designation.

1. In 1989, Arthur Young & Co. merged with Ernst & Whinney to form Ernst & Young, the appellant in this case.

Before BREYER, Chief Judge, CAMPBELL, Circuit Judge, and ZOBEL,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal presents two questions under the Employee Retirement Income Security Act ("ERISA"). Holding that 1) appellee has neither made out the elements of an estoppel claim nor established that his estoppel claim is actionable under ERISA, and 2) appellant's predecessor may be treated as the "administrator" of appellee's ERISA plan for purposes of appellee's statutory claim for failure to provide information concerning the plan, we reverse in part and affirm in part.

Appellee Donald Law was employed by the accounting firm of Arthur Young & Co.[1] ("Arthur Young") from 1967 to 1983. In 1983 Law withdrew from the partnership and engaged in several business ventures in New York and Massachusetts. At the time he withdrew he had certain vested pension rights entitling him to certain benefits which he could elect to start drawing then or at a time in the future. Depending on the time and plan selected, these would be in varying amounts.

The dates and places of Law's activities after he left Arthur Young are not entirely clear from the record, but it appears that, just before the time period at issue, Law acquired an equity interest in a Massachusetts company. After successfully revitalizing that company, Law sold it, apparently in January 1989 but possibly earlier. Meanwhile, sometime in 1988, Law moved to Maine and began to consider early retirement from business activity.

In the summer of 1988, Law made several phone calls to Arthur Young's offices in New York seeking information about the benefits he would receive if he elected to commence receiving his accrued benefits when he turned 55 that December. Law received an acknowledgment of his inquiries in a September 28 letter typed on Arthur Young's letterhead[2] and signed by

2. All of the letters from Arthur Young to Law were typed on stationery which had the phrase "A MEMBER OF ARTHUR YOUNG INTERNATIONAL" at the top, beneath which was printed in larger type "ARTHUR YOUNG."

"Gail Paduch/Administrative Assistant/Retirement Benefits Department." The letter contained no information on retirement benefits but informed Law that he would receive a response within 30 days. However, Law did not receive such a response until the following March, when he received a letter dated March 3, 1989 informing him of various options, including a commencement of benefits at age 55 with annual payments of $19,193. The letter instructed Law that "if you wish to have your retirement benefits commence at any time prior to December 1, 1993, you should send your request to the Management Committee via William L. Gladstone, Chairman." The letter was signed by Rosemary V. Kalin, whose job title was not provided.

On March 30, 1989, Law wrote to William Gladstone informing him of Kalin's letter and stating that "[p]rovided these estimates are close to actual when final calculations are made I am requesting ... benefits commence June 1, 1989." Law received no response to this letter and, on May 6, 1989, Law again wrote to Gladstone asking "[w]ould you please acknowledge receipt of this letter and advise me regarding the status of my request."

Law next received a letter from Kalin dated May 9, 1989 acknowledging receipt of his March 30 letter and informing him that, because of recent changes in the tax laws, Robert Brewster would be contacting him with further information. On this letter Kalin was identified as the "Partner Information Coordinator." Brewster, identifying himself as the "Director of Finance" and a former colleague of Law, wrote Law on May 12, 1989. Brewster's letter explained the election that had to be made, included the forms for making that election, and stated that "[a]t age 55 and five months your annual income is estimated at $19,193." It went on to state that if Law had any questions he was to call Kalin or Brewster.

On May 22, 1989, Law mailed the completed election forms to Brewster. In an accompanying letter Law stated that he intended to begin his retirement on July 1, 1989 with a benefit level "approximately as stated" in Kalin's letter of March 3, i.e., $19,193 per year.

When Law's first payment arrived in July, it was less than the expected amount. Law retained counsel who wrote to Arthur Young in August. Sometime after August 17, 1989 Arthur Young informed Law that his benefits under the plan were $11,199 per year, not $19,193.

Law filed a three-count complaint in the district court for the District of Maine. The complaint stated that Law was a participant in various retirement plans "administered by and on behalf [sic] Arthur Young & Co. (now known as 'Ernst & Young') (hereinafter referred to as 'Young')." It named as the defendant "Ernst & Young, successor to Arthur Young and Co." Count One alleged that "Young's wrongful acts" constituted a breach of its "fiduciary duties as sponsor, proponent and administrator of the Plans" in violation of two provisions of ERISA codified at 29 U.S.C. §§ 1104 and 1109. Count Two alleged that "Young" was estopped to refuse "to pay over the benefits represented to Law on March 3, 1989," i.e., $19,193 per year. This count did not mention ERISA and was presumably based on state law. Count Three alleged that plaintiff's counsel had requested from "Young" documents concerning the plans on August 14, 1989, that no such documents had been provided until October 23, 1989, that the documents provided on that date were incomplete, and that "Young's violations of its obligations" were continuing. It concluded that Law was entitled to a statutory payment of $100 per day under ERISA, 29 U.S.C. § 1132(c).

The district court issued a pretrial ruling holding that the plaintiff was limited to relief provided by ERISA because state law claims relating to the plans were preempted under *Ingersoll Rand Co. v. McClendon*, —— U.S. ——, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).[3] The court also denied

---

**3.** The district court held that all state law claims relating to three benefit plans in which Law had participated were preempted, but that claims relating to a fourth plan were not preempted.

without explanation Ernst & Young's request for a transfer to the Southern District of New York. Ernst & Young had claimed that transfer was warranted by a forum selection clause in Arthur Young's partnership agreement.

Following a bench trial, the district court denied Law's claim for breach of fiduciary duty on the ground that ERISA provides a cause of action for such breach only to the fund as a whole, not to individual participants. *See Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). However, the court found that Law had satisfied the elements of an estoppel claim because he had relied to his detriment on Arthur Young's erroneous calculation of his benefit level by retiring from his own business. Although the court had held that state law claims were preempted, it held that Law's estoppel claim was nevertheless actionable under 29 U.S.C. § 1132, ERISA's civil enforcement provision. The court therefore ordered that Ernst & Young was estopped to deny that Law was entitled to benefits of $19,193 per year. Finally, the court assessed a penalty of $12,600 against Ernst & Young for the late response to Law's request for information concerning his ERISA plan. This penalty was based on 29 U.S.C. § 1132(c) which provides that a plan "administrator" may be held liable for $100 per day when the administrator fails to respond within 30 days to a request for information concerning an ERISA plan.

On appeal, Ernst & Young argues that (1) this court should declare that the district court erred in denying its motion to transfer, (2) Law's estoppel claim is not actionable under ERISA, and (3) the district court's statutory penalty award was error.

## A. *The Forum Selection Clause*

■ Ernst & Young contends that the district court erred in denying its motion, pursuant to a forum selection clause in Arthur Young's partnership agreement, to transfer this proceeding to the Southern

District of New York. However, notwithstanding this alleged error, Ernst & Young does not ask us to nullify the proceedings already concluded in the district court for the District of Maine and order the case transferred now. To the contrary, we are asked to review the proceedings below on the merits and reverse the resulting judgment, something we would lack jurisdiction to do were we to hold that the case should have been tried in the Southern District of New York, a part of the Second Circuit. The only redress Ernst & Young now seeks for violation of the forum selection clause is a mere passing declaration by this court that the Maine district court erred in denying its transfer motion. This statement of ours would supposedly enable Ernst & Young later to enforce, in a separate proceeding, a damages provision in the partnership agreement for violation of the forum selection clause.

■ It is not the function of an appellate court to issue advisory opinions in order to help parties to a proceeding before it enforce their legal rights in some other tribunal. *See generally Boston Chapter, NAACP v. Beecher*, 716 F.2d 931, 933 (1st Cir.1983) (federal courts forbidden by Article III to render advisory opinions). In asking for a declaration that the trial court erred in refusing to transfer, without seeking any relief based on such error, Ernst & Young is reduced to asking for an advisory opinion with no practical bearing on the outcome of the district court proceeding under review. We lack the power under Article III to issue such an opinion and decline to do so.

## B. *Actionability of Law's Claim under ERISA*

The district court found that Law had made out a claim for estoppel which was actionable under the federal common law of ERISA. We hold that the district court erred for two reasons. First, Law did not establish the elements of an estoppel. Second, Law's estoppel claim is not actionable

---

Because it further found that the plaintiff was entitled to a jury trial on the claims relating to the fourth plan but not on those relating to the

first three, the district court dismissed without prejudice the claims relating to the fourth plan.

under ERISA because he did not establish that the estoppel would merely hold Ernst & Young to a plausible interpretation of the plan, rather than to a modification of that plan.

### 1. Elements of Common Law Estoppel

■ Although the point does not appear to be contested by Ernst & Young, Law argues in his brief that he made out the elements of an estoppel claim. We disagree. This court explained the elements of an estoppel claim in *Phelps v. Federal Emergency Management Agency*, 785 F.2d 13 (1st Cir.1986). First, the party to be charged must " 'make[ ] a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it.' " *Id.* at 16 (quoting Restatement (Second) of Torts § 894(1) (1977) ). Second, the other party must rely reasonably on the misrepresentation to his detriment:

> Thus, the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse," and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984) (footnotes and citations omitted).

In this case, the district court found that "[Arthur Young] gave [Law] erroneous information...." That finding is amply supported by the record. The record would also support a finding, although none was made, that Arthur Young had reason to believe that Law would rely on the information it provided. Finally, the district court found that Law, having received erroneous information, "retired from his own business. Then he was informed that his benefits would be considerably less than he had expected, which is certainly to his detriment and injury." Insofar as this finding

suggests that Law had worsened his position in reliance on the erroneous information by retiring from his own business, it lacks record support.

A crucial fact is the date on which the representation of the inflated retirement benefits was first made. Although Law first sought information from Arthur Young in the summer of 1988, the record indicates that the first time he was given a definite figure, i.e., the erroneous $19,193, was in Kalin's letter of March 3, 1989. Thus, March 3, 1989, is the earliest date on which Arthur Young could be said to have made a misrepresentation. Yet there is no evidence in the record that Law took any action *after* March 3, 1989, that placed him in a worse position than he was in before that date. In particular, nothing in the record shows that Law retired from his own business *after* receiving Arthur Young's erroneous and inflated pension information. Law testified that he left Arthur Young in 1983 and, several years later, moved to Massachusetts. Law then became president of a company in which he had an equity interest, but he testified that "in January of, oh, it will be two years, two years almost to the month, I was successfully able to complete the sale of the company to a buyer from Canada." As the trial took place in February 1991, Law's testimony indicates that he sold the business in January 1989. Then, when asked when he had started to consider early retirement, Law stated that "when I left the company whose situation I just recounted" he began to consider early retirement and began making phone calls to Arthur Young in the summer of 1988.[4] Later, on cross-examination, counsel for Ernst & Young asked Law about his depositions, in which he had stated that he "made the decision not to develop certain business opportunities that were available to me ... in the winter of '88 and '89 when I started having initial conversations with Bob Brewster...."

---

4. Law's testimony that he sold the business in January 1989 and that he began exploring the possibility of early retirement after leaving that business in the summer of 1988 may be inconsistent. Regardless, none of Law's testimony indicates that he sold the business any later than January 1989.

Thus it appears that Law had already decided to retire from his business and forgo other opportunities by the time he received Kalin's letter of March 3.[5] Moreover, Arthur Young offered to allow Law to rescind his decision to receive early retirement benefits, but Law declined this offer.[6] Therefore, the evidence does not support a finding that Law has established the detrimental reliance element of an estoppel claim.

### 2. Actionability of Estoppel Claim Under ERISA

■ Even if Law had established the elements of an estoppel, his estoppel claim would not be actionable under ERISA in this case. ERISA's civil enforcement provision states that:

A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) [omitted]

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to *obtain other appropriate equitable relief (i) to redress such violations or* (ii) to enforce any provisions of this subchapter or the terms of the plan....

29 U.S.C. § 1132(a) (emphasis added). Subsection (c), referred to in subsection (a)(1)(A) above, requires a plan administrator to respond within 30 days to a partici-

pant's request for information concerning his plan. 29 U.S.C. § 1132(c).

The district court found that Law was "a beneficiary seeking to obtain equitable relief for a failure to make timely and proper clarification of his rights under the plan." Then, noting the Supreme Court's language that the "appropriate equitable relief" provision of subsection (A)(3) demonstrated Congress's intent that the federal courts fashion federal common law, *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 156, 105 S.Ct. 3085, 3097, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring in judgment), the district court held that estoppel relief was proper under ERISA where the defendant's misrepresentations constituted a plausible interpretation, not a modification, of the plan. *See Kane v. Aetna Life Insurance,* 893 F.2d 1283 (11th Cir.1990) (ERISA plan administrator may be estopped to deny an earlier interpretation of a plan).

On appeal, Law argues that the district court correctly applied the Eleventh Circuit's holding in *Kane* because the applicable ERISA plans were ambiguous, and Arthur Young's earlier representations were a plausible interpretation thereof. In *Kane,* a husband and a wife had relied to their detriment on the representations of an ERISA plan administrator that all the hospital expenses of an adopted infant were covered under an ERISA plan. When the couple sued to hold the administrator to this interpretation of the plan,[7] the court found that "reasonable persons could disagree" whether the language of the plan could be interpreted consistently with the administrator's representations. *Id.* at 1285. The court therefore held that, because the administrator's representations "were *interpretations* of the Plan, and not

---

**5.** Although winter technically ends on March 21, the district court did not base its holding on a finding that Law had foregone business opportunities. Law never identified those alleged opportunities, and we do not think Law's vague reference to foregoing business opportunities in the winter of '88 and '89 suffices to establish detrimental reliance on the erroneous pension amount as occurring after March 3, 1989.

**6.** Law had, of course, retired from the partnership in 1983. Thus, it appears that Arthur

Young's offer would have allowed Law to return to his status as a former member of the partnership not yet receiving retirement benefits. This would apparently have allowed him to wait until age 60 to receive benefits, at which time the benefits would be greater.

**7.** The administrator later claimed that the plan only covered hospital expenses accruing after the adoption occurred.

modifications," the administrator was estopped to deny its earlier interpretation. *Id.* (emphasis in original).

This distinction between an *interpretation* about which "reasonable persons could disagree" and a plan *modification* was crucial to the *Kane* holding. The Eleventh Circuit cited to authority that the coverage of an insurance policy may *not* be modified by the doctrine of estoppel. *Id.* at n. 3. The court also distinguished an earlier case which had declined to hold that an estoppel claim based on an oral representation could be used to modify the terms of an ERISA plan. *Id.* at 1285. This earlier case had held that such a modification would violate Congress's direction that a plan be "established and maintained pursuant to a written instrument." *See Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986) (quoting 29 U.S.C. § 1102(a)).[8] Thus, the *Kane* court acknowledged that an ERISA plan could not be *modified* by the doctrine of estoppel. The *Kane* court, however, found a narrow window for estoppel recovery where the representation relied upon reflected an *interpretation* of the plan about which reasonable persons could disagree.

The district court here expressly accepted the Eleventh Circuit's approach, stating that "a plaintiff who relies on representations interpreting but not modifying a plan ... may rely on the doctrine of equitable estoppel" to recover the represented benefits. Law relies on this theory on appeal; he does not argue that estoppel recovery would be warranted if it would, in effect, modify his ERISA plans. Thus, to recover under his own theory, Law had to show that the higher amount stated in Kalin's March 3 letter, i.e., $19,193, reflected a reasonable alternative reading (as contrasted with the $11,199 finally offered) of the relevant plans.[9] This he failed to do.

At trial, Law and his expert witness testified simply that they could not determine the amount to which Law was entitled under the plans. Nevertheless, in his brief on appeal, Law argues that the district court necessarily found that the plans could reasonably be interpreted as providing the $19,193 pension first represented because the court's opinion stated that "a plaintiff

---

**8.** In addition to *Kane,* Law cites two other cases, both of which are inapposite. *See Ellenburg v. Brockway,* 763 F.2d 1091 (9th Cir.1985), and *Rosen v. Hotel and Restaurant Employees, et al.,* 637 F.2d 592 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). *Rosen* did not involve an ERISA plan. *Ellenburg* involved an ERISA plan but merely cited *Rosen* and another non-ERISA case, *Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981), for the proposition that "[e]stoppel principles have been applied to pension plans" and held that the elements of an estoppel had not been established. 763 F.2d at 1096.

**9.** We need not decide, for present purposes, whether this circuit would recognize an estoppel in the limited circumstances carved out in *Kane.* We hold simply that, even assuming *Kane* was correctly decided, Law failed to bring himself within its principles.

Two distinctions should be noted between the facts of this case and those of *Kane.* First, *Kane* involved an oral representation whereas this case involved a written representation. Law makes no attempt to distinguish *Kane* on this basis, arguing instead that recovery is warranted under the theory of that case. We think such an attempt would, in any event, fail. The importance of the oral nature of the representation in *Kane* was that any oral modification of a plan would be contrary to Congress's intent, expressed in 29 U.S.C. § 1102, that a plan be maintained in writing. However, that statute also requires that the plan set forth a "procedure for amending such plan." 29 U.S.C. § 1102(b)(3). Arthur Young's plan provided that it could only be amended "by action of its Management Committee." Although the timing of some of Kalin's correspondence with Law indicates a possibility that Kalin responded at one point to Law's letters to William Gladstone (chairman of the management committee), there was no finding that Kalin or Brewster were acting for the management committee. Thus, an amendment of the plan through their individual actions would contravene 29 U.S.C. § 1102 just as would an oral amendment.

Second, one of the defendants in *Kane* was the plan administrator. Here, the sole defendant is Ernst & Young, successor to Arthur Young, whereas the party named as plan administrator in the plan documents was the Arthur Young Retirement Committee. Although we hold in part C, *infra,* that Arthur Young may be treated as the plan administrator for purposes of Law's statutory penalty claim, we do not reach the questions whether Arthur Young could be so treated for purposes of recovery under *Kane,* or whether *Kane* would allow recovery against a party other than the plan administrator.

who relies on representations interpreting but not modifying a plan ... may rely on the doctrine of equitable estoppel ..." and cited *Kane.* Law claims that, having so stated and then found for Law, the district court must have found that Arthur Young's initial interpretation of the pension due under the plans was a plausible one. We are at a loss, however, to find any explicit finding to this effect and, more important, after carefully reviewing the record, we can see no reasoned basis on which the court could have determined that the amount originally stated in Kalin's letter was a plausible construction of the plans and not simply an error. Indeed, the district court itself stated in its opinion that Arthur Young had given Law "erroneous information" and that the second set of figures supplied by Arthur Young were the "corrected figures."

At oral argument this court asked Law to explain his interpretation of the plan, which he did in a subsequent letter to the court. Law's letter states that the plans are "ambiguous" and supports that claim by pointing to two letters he received from Arthur Young (and Ernst & Young) personnel. First is an August 15, 1989 letter from Brewster in which Brewster states that Arthur Young's earlier calculation of Law's benefits under the *"employee basic"* plan was incorrect. According to Brewster's letter, the plan required that Law's benefits be discounted because he retired early, at age 55. The earlier estimate of $7,245 per year did not reflect this discount, and the correct discounted figure was $3,937. Second is a September 28, 1989 letter from Lois Chamberlain, senior counsel to Ernst & Young, discussing the same corrected figure (setting it at $3,938) but stating that this was a corrected interpretation of the *"ERP supplemental benefit"* plan, not the employee basic plan.

We fail to see how these letters advance Law's argument that the initial figure given him was a plausible interpretation of the plans. The letters do not show that there was more than one plausible way to interpret the amount of Law's pension. Both

letters agree that Young's benefits under one of the plans had to be reduced from $7,245 to $3,937 because of a discount factor based on Law's age. The only disagreement is an apparent mistake by either Brewster or Chamberlain about the name of the plan to which the discount factor applied.[10]

Moreover, even if this disagreement does indicate some meaningful confusion among Arthur Young (and Ernst & Young) officials, that does not mean that the plans could be reasonably interpreted as originally represented to Law. The possibility that these officials continued to misstate some of the plan provisions in August and September 1989 does not mean that the Arthur Young's March 3, 1989 representation was itself a plausible interpretation, and not a misstatement, of the plans. With respect to the plans themselves (as opposed to Brewster's and Chamberlain's statements concerning the plans), Law makes only the conclusory allegation that "the [plans are], manifestly, subject to varying interpretations" without explaining what these "varying interpretations" are. The discount referred to in Brewster's and Chamberlain's letters applies to "Basic Retirement Benefits" and is governed by the following provision of the "Employees Retirement Plan."

> If a Participant's Basic Retirement Benefit payments begin at a date earlier than his Normal Retirement Date for reasons other than disability as provided in Section 6(d) they shall be discounted on an Actuarial Equivalent basis to compensate for the period to his Normal Retirement date as follows:
> [table follows]

Both "Normal Retirement Date" and "Actuarial Equivalent" are defined plan terms. "Normal Retirement Date" is defined as "the last day of the month in which a participant attains age 65." "Actuarial Equivalent" is defined as "an amount of equivalent value when computed at the rate of interest and on the basis of mortality and other tables approved by the Committee." Law has not explained how the

---

**10.** It appears that Brewster was correct in referring to the Employee Basic Plan.

above provision of the Employees Retirement Plan, the definitions, or the tables are "ambiguous" or how they could be plausibly interpreted to require the amount of benefits he now seeks. As the district court attempted no such findings itself, we hold that the district court erred in concluding that Law's estoppel theory was actionable under the theory set out in *Kane.*

### C. *The Statutory Penalty*

■ The district court assessed Ernst & Young a statutory penalty for Arthur Young's late response to Law's inquiry. ERISA provides that

> Any *administrator* ... (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... by mailing the material requested ... within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day....

29 U.S.C. § 1132(c)(1) (emphasis added). The court found that Law had made his first request for information on September 28, 1988, the date of Gail Paduch's letter acknowledging his inquiry. Thus, because 126 days had elapsed between October 30, 1988 (slightly more than 30 days after September 28) and March 3, 1989 (the date of Arthur Young's first response), the court found Ernst & Young liable for the maximum amount of $100 per day, or $12,600.

Ernst & Young argues that it cannot be held personally liable under this statute because its predecessor, Arthur Young, was not the plan administrator. ERISA provides that "[t]he term 'administrator' means—(i) the person specifically so designated by the terms of the instrument under which the plan is operated...." 29 U.S.C. § 1002(16)(A)(i). In this case the relevant documents provide that the plan administrator is a "Retirement Committee" to be appointed by Arthur Young's "Management Committee." Thus, Ernst & Young argues that only the Arthur Young Retirement Committee, not Ernst & Young (successor to Arthur Young), may be held liable for the statutory penalty. The district

court rejected this argument. Noting that "[s]ince its employees responded to Law's inquiries, [Arthur Young] led Law to believe that he was in contact with the correct department," the court concluded that "[Arthur Young] itself was the plan administrator."

We hold that, for purposes of Law's § 1132(c) claim, the district court properly regarded Arthur Young as the plan administrator. The court's determination was supported by the plethora of evidence indicating that Arthur Young had assumed and controlled the plan administrator's function of furnishing required information in response to a plan beneficiary's request.

■ A number of courts have stated that a party may be treated as a plan administrator where it is shown to control the administration of a plan. In *Boyer v. J.A. Majors Co. Employees Profit Sharing Plan,* 481 F.Supp. 454 (N.D.Ga.1979), a beneficiary brought suit against his employer and a number of other entities seeking benefits under an ERISA plan. The employer moved to dismiss on the ground that it was not the plan administrator, which role had been assigned to an internal committee. On the facts of that case, the court accepted the employer's argument because "there [was] no evidence that the Company controlled the Plan or had anything to do with its administration." *Id.* at 458. A "Profit Sharing Committee" had been elected at a meeting of the company board of directors, and there was no evidence that the employer had subsequently played any role in administration of the plan.

The same legal standard was applied to a different factual scenario in *Foulke v. Bethlehem 1980 Salaried Pension Plan,* 565 F.Supp. 882 (E.D.Pa.1983). There, a beneficiary sued his employer and others for improperly denying a lump sum payment of his benefits. The employer sought summary judgment on the ground that it could not be liable because the payment decision had been made by a separate entity, the General Pension Board. The court refused to grant summary judgment because the employer's vice chairman had

written a letter to the employees, on company letterhead, discussing changes to the plan. Distinguishing *Boyer*, the court concluded that the "employer may, as a matter of fact, have taken an active part in the administration of the pension plan," in which case it could be held liable for claims arising out of such administration. *Id.* at 883. Both *Boyer* and *Foulke* were cited with approval in *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.1988), in which the Sixth Circuit stated that "[u]nless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits."

We think this principle is correct and that it applies to Law's § 1132(c) claim. If, to all appearances, Arthur Young acted as the plan administrator in respect to dissemination of information concerning plan benefits, it may properly be treated as such for purposes of the liability provided under § 1132(c). To be sure, § 1002(16)(A)(i) states that the plan administrator is the party "specifically so designated" by the plan documents, and those documents named the Arthur Young Retirement Committee. But 29 U.S.C. § 1025 also confers upon plan participants and beneficiaries an absolute right to receive from the administrator information of the type sought here; and where an entity of which the administrator is part in effect holds itself out as the plan administrator by officially disseminating such information, we think it is subject to § 1132(c) liability should it fail to discharge that role in a proper way. Hence, where as here plan documents place the responsibility for providing information upon an internal committee of a firm, but the firm in practice carries out that function, we see no reason not to hold the firm liable under § 1132(c) when it fails to provide the information in the timely manner required by law.

This conclusion is consistent with the intent of Congress that employees have a remedy when they are denied timely information about their ERISA benefits. To hold that an entity not named as administrator in the plan documents may not be held liable under § 1132(c), even though it actually controls the dissemination of plan information, would cut off the remedy Congress intended to create. If a company ignored in practice any distinction between the administrator and itself, and assumed responsibility for responding to plan inquiries (as Arthur Young appears to have done here), both it and the purported plan administrator would be immune from liability. A § 1132(c) suit against the company would fail, because the company itself was not named administrator in the plan documents. Likewise, a suit against the plan administrator would fail, because employees would have had no reason to request information from the plan administrator if company personnel assumed responsibility for such requests. There being no request to the designated plan administrator, that entity could not be held liable for failure to respond properly.

There was ample evidence here from which the district court could conclude that Arthur Young itself controlled the provision of information concerning Law's ERISA plan.[11] First, the plan documents themselves show that Arthur Young exercised much control over all aspects of the Retirement Committee. Retirement Committee members were appointed by, and served at the pleasure of, the Arthur Young Management Committee. All "expenses in connection with administration of the plan" were paid by Arthur Young, and Arthur Young agreed either to indemnify, or purchase liability insurance for, claims against Committee members "arising from any action or failure to act in connection with the execution in good faith of [their] duties as a member of the Committee."

To be sure, these relationships would not by themselves prevent the Committee from maintaining an identity distinct from Arthur Young if the former had taken reason-

---

**11.** The district court appears to have reached such a conclusion, or at least something very close to it. Although it did not state that Arthur Young *controlled* the plan's administration, the district court found that, because Arthur Young employees responded to Law's requests, Arthur Young *"was* the plan administrator." (Emphasis added).

able steps to preserve the separation, such as by using identifying stationery. But the closeness of the two entities assumes particular significance when added to the fact that Law's request was processed by Arthur Young employees using firm stationery, who never once mentioned the Committee nor indicated they were not working for Arthur Young itself.

Hence, Law's request for information to Robert Brewster, Arthur Young's director of finance, was acknowledged in a letter on Arthur Young stationery from Gail Paduch, identified only as a member of the "Retirement Benefits Department." Law next received a letter, from Rosemary Kalin, also on Arthur Young stationery, informing him of various plan options and instructing him to contact William Gladstone, chairman of the (Arthur Young) Management Committee, to commence receiving benefits. In response to his letter to Gladstone, Law received another letter from Kalin, informing him that Brewster would contact him with further information. Brewster did so, in a letter stating the amount of benefits to which Law was supposedly entitled and enclosing the forms necessary for commencing these benefits. The record contains nothing to show, throughout the entire eight month course of these contacts, that Law's request was ever forwarded to the Retirement Committee as such or that the people dealing with Law were acting on the Retirement Committee's behalf.[12] Instead, persons presenting themselves solely as officials of Arthur Young, including its director of finance and the partner information coordinator (who appears to have responded to correspondence addressed to the chairman of the Management Committee) responded, on Arthur Young stationery, to Law's inquiries and provided him

with information. The district court was entitled to conclude from this evidence that Arthur Young itself was voluntarily assuming, and that it controlled, the information-providing function (at least) of the Retirement Committee. We hold, therefore, that the court properly treated Arthur Young as the *de facto* plan administrator for purposes of Law's § 1132(c) claim. We therefore affirm the lower court's judgment for $12,600 against Ernst & Young.[13]

This result is not inconsistent with the decisions of other circuits refusing to impose § 1132(c) liability on entities other than the plan administrator. *See Moran v. Aetna Life Insurance Company*, 872 F.2d 296 (9th Cir.1989) (divided panel) (refusing to hold insurance company liable under § 1132(c) because it was not plan administrator, even though its employee had represented to plan participant that it was); *Davis v. Liberty Mutual Insurance Co.*, 871 F.2d 1134, 1139 n. 5 (D.C.Cir.1989) (refusing to hold insurance company liable under § 1132(c) because it was not plan administrator). Those cases involved attempts to recover against entities which were clearly distinct from the plan administrator and which were not shown to have exercised actual control over the administrator's functions. Such a situation is different from that here, where the employer against whom recovery was sought had set up an internal committee with little, if any, separate identity, and in fact took control of the function allegedly delegated to that committee.

■ Ernst & Young also argues that the dates on which the district court's damages award was based were inconsistent with the dates pleaded in Law's complaint. Law's complaint averred that Law's counsel had asked "Young" to provide "trust instruments and other documents concern-

**12.** There was some testimony as to Brewster's general authority to carry out the "paperwork" functions of the Retirement Committee, but not to make "discretionary" decisions. This testimony was presented in order to show that Brewster could not alter the amount of benefits due to Law under the plans. *See supra.* There was no indication that the Retirement Committee had delegated its information function to Brewster.

**13.** In affirming the judgment against Ernst & Young, we do not actually decide whether personal liability under § 1132(c) may be imposed upon a successor entity. Ernst & Young has not argued that it may not, and any such argument contrary to the judgment below is therefore waived. *See Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1 (1st Cir.1983).

ing the plans" on August 14, 1989 and received no response until October 23, 1989, when "incomplete documents" were provided. However, the district court found Ernst & Young liable for its failure to provide information between September 28, 1988 and March 3, 1989. Ernst & Young argues that the earlier delay was an issue not raised in the pleadings, upon which judgment could not be entered.

We reject this argument. Rule 15(b) of the Federal Rules of Civil Procedure provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." We think that Ernst & Young implicitly consented to try the issue of Arthur Young's failure to respond in timely fashion to Law's September 28, 1988 request.

The test for implied consent to trial on a given issue is "whether a party did not object to the introduction of evidence or introduced evidence himself that was relevant *only* to that issue." *Lynch v. Dukakis*, 719 F.2d 504, 508 (1st Cir.1983) (emphasis added). The evidence here concerning Law's penalty claim was presented through Law's own testimony. After Law had testified that he began thinking about early retirement in 1988, he was asked to identify the letter from Gail Paduch acknowledging his request for information. The following colloquy ensued:

Law:.... [Paduch's letter] acknowledges receipt of my request for retirement benefit information and says that I would receive a response within approximately 30 days regarding the status of my inquiry.

Q. That was on September 28, 1988?

A. Right.

Q. Did you, in fact, receive a response within 30 days?

A. No. [Law is asked to identify letter from Rosemary Kalin describing estimated benefits.]

Q. And would you describe it for the court please.

A. Well, first of all, it's dated March 3, 1989 or about five months after the initial preparation.

Ernst & Young acknowledges that it did not object to any of this testimony but claims that it was relevant both as general background information and as evidence that Kalin and Paduch were acting as the plan administrators. Thus, it argues that its failure to object cannot be viewed as implying consent to try the penalty issue. We disagree. While aspects of Law's testimony doubtless related to these other matters, its main emphasis appears to have been the specific dates and the lapse of time in answering, factors of no particular importance either as background or to the plan administrator question. Law was specifically asked whether, after Paduch's acknowledgment, he received a response within the 30 day statutory period. Moreover, when asked about Kalin's response, Law emphasized that this response had come five months after the inquiry. Given this focus on the specific dates and timing, we hold that Ernst & Young implicitly consented to try the timeliness of the response to the September 28 request. In so holding, we note that Ernst & Young has never pointed to any evidence that it might have wished to present had it been more fully alerted to the presence of that issue. Law's testimony that he did not receive a response to his September 28 request until March 3, 1989 went uncontested.

The order of the district court contained in paragraph two of its judgment that Ernst & Young is estopped from asserting that Law's benefits are less than $19,193 per annum is *reversed*. The order contained in paragraph three of said judgment assessing a penalty of $100 per day, for a total penalty of $12,600 against Ernst & Young is *affirmed*. The judgment is vacated and the case remanded with directions to enter a new judgment consistent herewith. Each party to bear its own costs.

*So ordered.*