United States Court of Appeals,

Eleventh Circuit.

No. 95-2078.

Harry L. HUNT, Plaintiff-Appellee, Cross-Appellant,

v.

HAWTHORNE ASSOCIATES, INC., Defendant,

Eastern Air Lines Variable Benefit Retirement Plan for Pilots;  Trust Administrative Committee of the Eastern Airlines Variable Benefit Retirement Plan for Pilots, Defendants-Appellants, Cross-Appellees.

Aug. 5, 1997.

Appeals from the United States District Court for the Northern District of Florida.  (No. 92-40064-WS), William Stafford, Judge.

Before TJOFLAT and COX, Circuit Judges, and CLARK, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Harry L. Hunt is a retired Eastern Air Lines ("Eastern") pilot seeking to recover a lump-sum retirement benefit under the Eastern Air Lines Variable Benefit Retirement Plan for Pilots (the "Plan").[1]  Eastern, the Plan's administrator, which is a debtor before the Bankruptcy Court for the Southern District of New York, has refused to pay the benefit because the Plan has been amended, with the approval of the bankruptcy court, to foreclose the lump-sum benefit Hunt seeks.  As the Plan now stands, Hunt is entitled to receive only a modified lump-sum benefit:  he may receive a partial distribution immediately and subsequent payments over time as the Plan's assets are liquidated.

Hunt rejected this modified lump-sum benefit, as well as other payment options provided under the Plan, and sued Eastern;  the Air Line Pilots Association ("ALPA"), the pilots' union;  Charles H. Copeland, the Chairman of the Trust Administrative Committee (the "TAC"), the Plan's named fiduciary;  Paul M. O'Connor, Jr., of O'Connor, Morris & Jones, the TAC's legal counsel (the "O'Connor law firm");  and Hawthorne Associates, Inc. ("Hawthorne"), the TAC's principal

---

[1]The Plan's originating document refers to the plan as the "B-Plan."  For simplicity, we use the name "Plan."

investment advisor, to recover his retirement benefit in a lump sum. Hunt brought his suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93-406, 88 Stat. 829, 29 U.S.C. §§ 1001-1461 (1994). His complaint, framed in six counts, asked for compensatory and punitive damages, injunctive relief in the form of an order requiring the defendants to pay his lump-sum benefit, statutory penalties, and attorneys' fees.

Eastern's Bankruptcy Trustee, in a motion for summary judgment, contended that Eastern could not be held liable to Hunt because it had properly discharged its responsibilities as administrator under the Plan. Later, when opposing Hunt's motion for leave to file an amended complaint, Eastern argued that Hunt's claim for a lump-sum benefit had been foreclosed by a bankruptcy court ruling against Hunt in Eastern's bankruptcy case. In an apparent attempt to avoid the effect of this ruling, Hunt voluntarily dismissed Eastern from the case with prejudice and, with leave of court, filed an amended complaint against three defendants—Hawthorne, the TAC, and the Plan—that asserted essentially the same claims presented in his initial complaint.

The case was tried to the district court; by that time, the only defendants before the court were the TAC and the Plan. Without referring to the bankruptcy court's ruling against Hunt, the court held that he was entitled to his lump-sum benefit and entered judgment for Hunt in the amount of that benefit. The judgment stated that the benefit was to be satisfied out of the Plan's fund of assets. The court rejected Hunt's remaining claims and entered judgment for the defendants.

The TAC and the Plan now appeal. Hunt cross-appeals the court's rejection of his claim requesting the court to impose a statutory penalty on the defendants. We reverse the court's judgment against the TAC and the Plan, and affirm its judgment on the statutory-penalty claim.

I.

Hunt claims that, under ERISA and the provisions of the Plan, he is entitled to recover his retirement benefits in a lump sum. Unlike the typical scenario in which a participant in an employee benefit plan sues to recover ERISA benefits, Hunt sought his lump-sum payment while the administrator of the Plan, Eastern, was undergoing a highly publicized bankruptcy proceeding that ultimately resulted in the company's demise. In addition to scrutinizing ERISA and the provisions

and operation of the Plan, we must therefore consider the interrelationship between the Plan and Eastern's bankruptcy in order to evaluate Hunt's claims for relief.

A.

ERISA is a "comprehensive and reticulated statute" that created a framework for the administration and maintenance of private employee benefit plans. *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). The cornerstone of an ERISA plan is the written instrument, which must provide for "the allocation of responsibilities for the operation and administration of the plan." ERISA § 402(b)(2), 29 U.S.C. § 1102(b)(2); *see also* ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument.").

The written instrument must designate an "administrator," ERISA § 3(16)(A)(i), 29 U.S.C. § 1002(16)(A)(i), "to run the plan in accordance with the ... governing plan documents." *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 84-86, 115 S.Ct. 1223, 1231, 131 L.Ed.2d 94 (1995); *see also Varity Corp. v. Howe,* --- U.S. ----, ----, 116 S.Ct. 1065, 1086, 134 L.Ed.2d 130 (1996) ("Essentially, to administer the plan is to implement its provisions and to carry out plan duties imposed by [ERISA].") (Thomas, J., dissenting). In some instances, ERISA imposes specific obligations on the plan administrator. *See, e.g.,* ERISA § 101(b), 29 U.S.C. § 1021(b) (duty to file plan description, modifications and changes, and reports with the Department of Labor); ERISA § 105(a), 29 U.S.C. § 1025(a) (duty to provide plan participants with information regarding their benefits).

The written instrument must also "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The administrator, as well as the named fiduciary, is considered a "fiduciary" under ERISA.[2] Both the administrator and the named fiduciary must

---

[2] The term "fiduciary" has a broader meaning under ERISA than at common law because ERISA "defines "fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan." *Mertens v. Hewitt Associates,* 508 U.S. 248, 262, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993). Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), a fiduciary includes not only those who "exercise[ ] any discretionary authority or discretionary control

discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]," ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), "for the exclusive purpose of providing benefits to participants and their beneficiaries," ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A). Because both the plan administrator and named fiduciary must discharge their duties in accordance with the written instrument, we examine the provisions of the Plan in detail.[3]

B.

The Plan is a variable benefit pension plan for Eastern pilots that was created in 1958 pursuant to a collective bargaining agreement between Eastern and ALPA. The parties rewrote the Plan in the 1970s to comply with ERISA and subsequently amended it in 1986.[4]

The Plan is a "defined contribution plan."[5] According to 26 U.S.C. § 414(i), a defined contribution plan is a "plan [that] provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." More simply, in the words of an ALPA newsletter sent to Eastern pilots, a participant's interest in a defined contribution plan is "determined solely by

---

respecting management of such plan or exercise[ ] any authority or control respecting management or disposition of its assets," but also those who "[have] discretionary authority or discretionary responsibility in the administration of such plan." The Supreme Court has referred to ERISA's definition of fiduciary as "artificial." *Mertens*, 113 S.Ct. at 2068 n. 5, 508 U.S. at 255 n. 5.

[3]Given the seminal importance of the written instrument under ERISA, we are puzzled why the parties made little more than a passing reference to the Plan documents in their briefs and at oral argument.

For simplicity and clarity, we refer to the specific provisions of the Plan by citing directly to the relevant section or subsection. In some instances, the title of the section or subsection is noted parenthetically.

[4]The original written instrument that established the Plan is known as "Document 91." The 1986 amendment is known as "Document 91A."

[5]Section 12.14 of the Plan, titled "Plan Is Defined Contribution Plan," states: "Since [the Plan's inception], the Plan has been and continues to be a defined contribution plan." This section appears in Document 91C, an amendment to the Plan that will be discussed in part I.D, *infra.*

contributions made in a beneficiary's name and the subsequent investment performance of those contributions." The Plan requires that Eastern make contributions on behalf of each participant, *see* § 4.1 ("Eastern Contributions"),[6] for investment in stocks, bonds, real estate, and other assets. These investments constitute the Plan's "Variable Fund" (the "Fund"). *See* § 1.36 ("Variable Fund").[7] As a result, the value of a participant's interest in the Plan depends not only upon the funds contributed but also on the investment return on the Fund's assets. *See Borst v. Chevron Corp.,* 36 F.3d 1308, 1311 n. 2 (5th Cir.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995). The value of the Fund is calculated annually as of December 31 of each calendar year. *See* § 5.1 ("Fund Value").

The Plan designates Eastern as the "plan administrator." Eastern has "those powers necessary to carry out the day to day operation of the Plan." *See* § 2.2(a) ("Administration"). Those powers include the broad responsibility to "initially determine all questions arising from the administration, interpretation, and application of the Plan pursuant to all applicable law, agreements and contracts and such determination shall be binding upon all persons, except as otherwise provided by law, and further provided that each Participant shall be granted the same treatment under similar conditions." *Id.* The Plan also charges Eastern with the responsibility for, *inter alia,* keeping records, *see* § 2.4 ("Records"), preparing and distributing periodic Plan summaries, *see* § 2.5 ("Plan Summary"), and sending to each participant an annual statement reflecting the value of his investment in the Plan, *see* § 2.6 ("Annual Statement"). Section 13.1 of Article XIII, which is titled "Modification, Suspension or Discontinuance," grants Eastern the authority to unilaterally

---

[6]According to the original agreement, Eastern was to contribute on behalf of each participant an amount equal to 11% of his compensation. On February 23, 1986, Eastern and ALPA signed a collective bargaining agreement that adjusted Eastern's contribution level in two ways: (1) for pilots employed before March 2, 1986, Eastern's contribution was set at 10% effective January 1, 1988; (2) for pilots employed on or after March 2, 1986, Eastern's contribution was set at 3%. In addition, participants had the option of contributing up to 10% of their earnings as "optional additional contributions" to augment their interest in the Plan. *See* § 4.2 ("Optional Additional Contributions").

[7]According to § 1.36, the Fund is "the property of the Plan, ... all of which is held in trust pursuant to Trust Agreement between the [TAC] and State Street Bank and Trust Company ... and any other trust created for such purpose by the [TAC]."

modify, suspend, or discontinue any feature of the Plan, provided that any such action does not "adversely affect" any benefits "already provided" to a participant under the Plan. An exercise of this authority, however, would not constitute an amendment to the Plan.[8]

The Plan designates the TAC, a small committee that monitors the management of the Plan's assets,[9] as its "named fiduciary." Under the Plan, the TAC has "overall supervisory responsibility of the administrative functions of the Fund," *see* § 2.13(b)(i) ("Fund Administration"), and the duty "to maintain surveillance over the status and administration of the Plan and the [Fund]," *see* § 10.2(b) ("Rights and Duties of the [TAC]"). It must "regularly and periodically suppl[y]" information to ALPA about "transactional detail, cash flow reports, investment status, documentation and Fund performance," *see* § 2.11 ("Information and Accountability"), and furnish to ALPA and Plan participants reports about the TAC's "functions, actions, and decisions ... as are reasonable and appropriate." *See* § 10.2(c). Furthermore, the TAC is charged with the responsibility of selecting and replacing investment advisors and trustees of the Fund's assets, *see* § 2.7(b) ("Trust Agreement and Trustee"), as well as giving directions and instructions to these trustees, *see* § 2.8 ("Directions to Trustee(s)"). Before selecting or replacing investment advisors or trustees, however, the TAC must notify ALPA of the TAC's planned course of action and give ALPA an opportunity to respond, *see* § 2.7(b), thus effectively giving ALPA a quasi-veto power over these decisions.

_____

[8]The Plan documents do not explicitly describe how the Plan may be formally amended. The closest provision is § 14.1, which states that Eastern and ALPA must agree upon any modification that is necessary for the Plan to qualify as a pension plan under ERISA. *See* § 14.1 ("Qualification of Plan"). The record makes clear, however, that both Eastern and ALPA must approve any substantive amendment to the Plan, with the exception of an amendment made pursuant to § 1113(e) of the Bankruptcy Code, 11 U.S.C. § 1113(e). *See infra* note 20.

[9]The TAC initially consisted of two members selected by ALPA, two members selected by Eastern, and three "outside" members chosen by ALPA and Eastern. By the time of the events involved in the present controversy, the Plan had been amended to provide that two members were to be selected by ALPA, and five outside members would be appointed by the existing TAC members with ALPA's approval. TAC's outside members at this time included former President Gerald R. Ford; a former president of Citicorp, William I. Spencer; a former chairman of the board of Metropolitan Life Insurance Company, George P. Jenkins; and a former dean of the Harvard Business School, Lawrence E. Fouraker.

The compensation for the outside TAC members is paid by the Fund, *see* § 2.2(b)(iii), whereas the compensation for TAC members from ALPA is paid by ALPA, *see* § 10.1(b)(ii).

Similarly, before giving any notice or instruction to a Fund trustee, the TAC must notify ALPA and give it fifteen days to object. *See* § 2.8.

Pursuant to its authority under sections 2.7 and 2.13(d),[10] the TAC hired Hawthorne as the Plan's principal investment advisor/manager for the time period relevant in this case. Hawthorne's duties are enumerated in a written "investment advisor agreement" between the TAC and Hawthorne. According to the testimony of Hawthorne's chairman, Charles G. Dyer, Hawthorne assumed many of the TAC's administrative duties involving the Fund and its assets, including the scheduling of TAC meetings and the release of quarterly statements to participants about the value of the Fund's assets. In essence, Hawthorne served "at the pleasure of the [TAC]."

C.

Since the Plan's inception, an Eastern pilot choosing normal or early retirement could elect to receive his benefits in the form of monthly annuity payments.[11] Beginning in 1983, a retiring pilot also could elect to receive his benefits in the form of a lump-sum payment.

Processing an application for a lump-sum benefit involved five steps.[12] First, a pilot seeking a lump-sum payment would complete the necessary paperwork and inform the Chief Pilot, an Eastern management employee, of his intention to retire. Second, the Chief Pilot would check to

---

[10]According to § 2.13(d), the TAC "may delegate to any person, including, but not limited to, Investment Advisors, all or any portion of the [TAC's] powers, duties and responsibilities to establish and maintain a Fund Office, to maintain records and to prepare reports and documentation. The [TAC] shall make such delegations in writing and is authorized to pay reasonable fees, charges and costs of the person or persons providing such service." This delegation of authority is consistent with ERISA. *See* ERISA § 402(c)(3), 29 U.S.C. § 1102(c)(3).

[11]The Plan provided participants with a panoply of annuity options. Retiring pilots selecting an annuity could choose from the post-retirement joint and survivor annuity, the contingent annuity, the level income option, the life annuity option, and the deferred payment option. *See* § 6.2 ("Available Forms of Payment"). There also was a disability benefit option. *See* § 6.3 ("Disability Benefit").

[12]The Plan does not explicitly set forth the procedure for processing claims for retirement benefits. The above account of the claims-processing procedure is taken from the deposition and affidavit of Charles Dyer of Hawthorne and from the affidavit of Brian P. White, who served as Director of the Eastern Pension and Insurance Department. Both accounts of Eastern's claims-processing procedure are virtually identical. After the trial, the district court, in fashioning its order directing the entry of judgment, relied exclusively on the account given in the White affidavit.

make sure that the pilot met age criteria to qualify for normal or early retirement benefits under the Plan.[13] Third, if the pilot met the age qualifications, the Chief Pilot would inform the Eastern Pension and Insurance Department about the pilot's decision to retire. Fourth, the Eastern Pension and Insurance Department would contact the Plan's actuary, William M. Mercer, Inc., which would determine the precise amount of benefits to which the retiring pilot was entitled. Fifth, the actuary would then give that information to the State Street Bank & Trust Company, a Plan trustee, which would make the distribution to the pilot. The lump-sum payment would be equal to the entire actuarial present value[14] of the pilot's accrued benefit[15] as of his effective retirement date.[16] *See* § 6.2(e)(i) ("Lump Sum Option"). A pilot dissatisfied with the disposition of his application for benefits could pursue administrative relief with the Pension Dispute Board pursuant to Article XI ("Determination of Disputes") of the Plan.[17]

## D.

In the late 1980s, Eastern was experiencing severe financial difficulties against the backdrop of a highly publicized labor dispute. On March 9, 1989, Eastern filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101-1174, in the Bankruptcy Court for the

---

[13]Normal retirement age under the Plan is 60. *See* § 1.22 ("Normal Retirement Age"). The minimum early retirement age is 50. *See* § 1.15 ("Early Retirement Date").

[14]"Actuarial present value" is the current value of monthly benefits determined by the current value of an annuity unit at the most recent valuation. *See* § 1.6 ("Actuarial Present Value").

[15]An "accrued benefit" is essentially the total number of "annuity units" credited to the account of a participant. *See* § 1.2 ("Accrued Benefit"). An annuity unit is a unit of measure representing a share in the Fund. *See* § 1.7 ("Annuity Unit").

[16]"Effective retirement date" essentially means the normal retirement date or early retirement date. *See* § 1.18 ("Effective Retirement Date"). The normal retirement date is the first day of the month coinciding with or otherwise next following a participant's 60th birthday. *See* § 1.23 ("Normal Retirement Date"). The early retirement date is the first day of the month on which a participant elects to retire and receive a pension, provided that he is at least 50 years old. *See* § 1.15(a) ("Early Retirement Date").

[17]The Pension Dispute Board consisted of four members: two were selected by Eastern and two were selected by ALPA. The Board had the authority to hear and determine "[a]ll disputes concerning the application, interpretation or administration of the Plan in respect to individual employees and their participation in or their benefits under the Plan." § 11.2 ("Authority [of Pension Dispute Board]").

Southern District of New York. On March 20, 1990, Eastern and ALPA signed an interim letter of agreement, effective March 2, 1990, fixing Eastern's contribution to the Plan for all pilots at 3% of compensation.[18] On April 18, 1990, the bankruptcy court named Martin R. Shugrue as Bankruptcy Trustee of Eastern (the "Bankruptcy Trustee"). The Bankruptcy Trustee began liquidating certain company assets in an attempt to reorganize Eastern as a smaller carrier.[19]

On September 11, 1990, the Bankruptcy Trustee, proceeding under section 1113(e) of the Bankruptcy Code, applied to the bankruptcy court for an order, which the court entered, approving an amendment to the Plan.[20] Pursuant to this order, Eastern reduced its contribution to the Plan to 0% for compensation earned by pilots after August 11, 1990, and provided for resumption of its contribution of 3% for such compensation on or after June 1, 1991. This amendment also suspended the Pension Dispute Board's powers effective August 11, 1991. ALPA objected to the Bankruptcy Trustee's action and appealed to the district court the bankruptcy court's order authorizing this amendment. The record does not inform us of the district court's disposition of this appeal.

After Eastern's Chapter 11 filing, the Fund became increasingly illiquid due to three factors. First, because Eastern had suspended and eventually ceased making contributions to the Plan, the Fund's sole source of cash was the return on its investments. Second, a substantial portion of the Fund's assets were invested in real estate, which was depressed in value due to a nationwide real estate recession. Third, the lump-sum option for receiving benefits had become increasingly popular with retiring pilots. In fact, the annual amount distributed in lump-sum payments had risen steadily from $52,000,000 in 1986 to more than $200,000,000 in 1990.

---

[18]For Eastern pilots employed before March 2, 1986, Eastern had been contributing 10% of compensation since January 1, 1988. *See supra* note 6.

[19]The record indicates that the Eastern Pension and Insurance Department retained its authority and continued to perform its responsibilities under the supervision of the Bankruptcy Trustee.

[20]Section 1113(e) of the Bankruptcy Code, 11 U.S.C. § 1113(e), states that the bankruptcy court, "after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement." The bankruptcy court may authorize such measures only if they occur "during a period when the collective bargaining agreement continues in effect," and "if [such measures are] essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate."

On January 18, 1991, Eastern shut down its operations, effectively retiring the approximately 2,500 pilots in its employ at the time. The same day, O'Connor of the O'Connor law firm, which served as counsel to the TAC, contacted Brian P. White, Director of Eastern's Pension and Insurance Department, and told White that the TAC "recommended" that Eastern place a temporary moratorium on lump-sum payments. White, in response, said that Eastern lacked the authority to impose a moratorium. On January 19, 1991, O'Connor confirmed the recommendation by letter, a copy of which he sent to ALPA, the TAC, and Hawthorne.

On January 27, 1991, according to the deposition testimony of former President Gerald R. Ford, the TAC voted unanimously to impose the temporary moratorium.[21] The record does not disclose how the TAC planned to implement the moratorium.

On January 28, 1991, O'Connor, representatives of ALPA and Eastern and their respective attorneys,[22] met to discuss the need to place a temporary moratorium on lump-sum payments. The record does not disclose whether at this meeting the parties discussed Article XIII of the Plan, which gives Eastern the power to "modify, suspend ... or discontinu[e] ... any feature [of the Plan]."

On February 1, 1991, the TAC issued a "Certificate of Action of the [TAC of the Plan] Taken upon Unanimous Written Consent." In this document, the TAC stated that it, "as named fiduciary of the [Plan], has decided to, and hereby does, impose a temporary moratorium upon the payment of benefits to all Eastern pilots who shall file requests for benefits after the close of business on January 18, 1991."[23] This Certificate also instructed O'Connor to "notify [Eastern] of the [TAC's] request that Eastern, as [Plan] Administrator, promptly notify all Eastern pilots who shall file requests for benefits after the close of business on January 18, 1991, that, until further notice, a

---

[21]In his deposition, former President Ford, a member of the TAC at the time the moratorium was imposed, *see supra* note 9, stated that "[the decision to impose the moratorium] was unanimous between Mr. Spencer, Mr. Jenkins, Mr. Fouraker, the [ALPA] members, and myself."

[22]The record does not indicate whether the Bankruptcy Trustee was present, or represented, at the meeting.

[23]The moratorium did not affect participants who were already receiving annuities or who had submitted their application for a lump-sum benefit by the close of business on January 18, 1991.

temporary moratorium has been placed in effect by [the TAC]." Pursuant to the TAC's request, Eastern mailed notice of the moratorium to all of its pilots on February 4, 1991.[24] In this notice, Eastern advised pilots that "[q]uestions regarding the temporary moratorium should be addressed to the [TAC]" at one of the following addresses: (1) the TAC, care of the O'Connor law firm; or (2) the TAC, care of Hawthorne.

White stated that, after Eastern's shutdown and the commencement of the moratorium, the procedure for processing claims for benefits under the Plan remained the same except for two changes: (1) the retiring pilot would contact Eastern's Pension and Insurance Department directly rather than go through the Chief Pilot; and (2) Eastern's Pension and Insurance Department would inform the actuary whether a participant had applied for benefits following the shutdown. If the participant had applied after the shutdown, the bank would not issue a benefit check.

On May 22, 1991, the TAC mailed a letter and a videotape to all Plan participants and beneficiaries. The letter and videotape were designed to inform these parties about the current status of the Plan and its plans for the future in light of the "present liquidity issues confronting the [Plan]"—that is, the state of the Plan after Eastern's shutdown and bankruptcy.

On June 25, 1991, the Bankruptcy Trustee and ALPA modified the Plan by letter of agreement.[25] This agreement modified the Plan in three significant ways. First, the Plan provided for a periodic-payment option that enabled participants to receive their retirement benefit in substantially equal monthly payments that were made for life (or life expectancy). *See* § 6.11 ("Periodic Payments"). These payments would be exempt from the ten percent additional tax assessed on early distributions from qualified retirement plans.[26] Second, a new article (Article XV)

_____

[24]This mailing consisted of two documents: (1) a brief cover letter printed on Eastern stationery; and (2) a two-page notice about the moratorium signed by the TAC and addressed to all Eastern pilots.

[25]This agreement is known as "Document 91B."

[26]Under the "periodic payment" option, a participant could elect to receive the actuarial present value of his accrued benefit in the form of periodic monthly payments as described in I.R.C. § 72(t)(2)(A)(iv), 26 U.S.C. § 72(t)(2)(A)(iv); under this option, the benefit amount was determined as of the date of receipt. Participants who were receiving an annuity or had an outstanding balance on a loan from the Fund were not eligible for this option. If the

was added in order to enable participants to take out loans from the Plan during this time of financial uncertainty.[27] The amendment provided that the TAC would serve as administrator for these two provisions; Eastern, however, retained its administrative authority for all other provisions of the Plan. *See* §§ 6.11(f), 15.1. Third, the Plan was amended to provide that the value of benefits distributed from the Plan was to be determined at the time of distribution. Thus, the value of a participant's lump-sum benefit would no longer be determined as of the effective retirement date. *See* § 6.2(e)(i).

On July 27, 1992, pending approval by the bankruptcy court, the Bankruptcy Trustee and ALPA entered into a letter of agreement once again. Referred to as Document 91C, this proposed amendment would make two fundamental changes to the Plan. First, the Fund would be divided into a liquid portion (i.e., cash, marketable stocks, and bonds) and an illiquid portion (i.e., real estate, alternative investments, and working capital). Each Plan participant would have a percentage interest in both the liquid and illiquid portions of the Fund rather than an interest in the Fund as a whole. Second, the lump-sum option was modified to provide for a partial distribution—that is, an immediate cash payment equal to the liquid portion of each eligible participant's account. A participant selecting this option also would receive extended payments over time as the real estate and other illiquid assets were sold. The modified lump-sum option had become feasible because of recent favorable changes in the tax code for partial distributions.[28]

---

periodic-payment arrangement was discontinued or altered within five years after it started or before the participant reached age 59.5, whichever was later, the participant's subsequent election of another form of benefit from the Plan would trigger the 10% penalty tax normally associated with premature distributions, unless the participant was 55 or older when separating from Eastern. If the penalty tax was triggered, it would be applied retroactively to those amounts previously withdrawn. *See* § 6.11.

[27]Participants who were annuitants or periodic-payment recipients were not eligible to receive loans from the Plan. The maximum loan that could be made was the lesser of $50,000 or 25% of the actuarial present value of the participant's accrued benefit at the time of loan. *See* § 15.4 ("Plan Loans").

[28]Effective January 1, 1993, partial distributions from a qualified pension plan could be rolled over into an individual retirement account ("IRA") without adverse tax consequences. *See* 26 U.S.C. § 402(c)(4) (1993). Before this change, a participant could not roll over a partial distribution into an IRA without significant tax liability. *See* 26 U.S.C. § 402(a)(5)(D) (1991).

On August 19, 1992, pursuant to its duties under section 10.2(c), the TAC sent a letter to all Plan participants to describe the modified lump-sum option and to explain why the moratorium had been imposed:

> The lump sum option in the [Plan] has been modified by Document 91-C to address the reality that the [Plan] has a substantial amount of high quality illiquid assets that cannot be liquidated quickly without suffering a substantial discount in order to achieve a quick sale. The [Plan] does not have sufficient cash and other liquid assets to allow eligible participants to take their lump sum in cash. This is what caused the imposition of the moratorium in January 1991.

On October 1, 1992, the Bankruptcy Trustee and ALPA filed a joint motion in the Bankruptcy Court for the Southern District of New York seeking approval of the amendment provided by Document 91C. On November 13, 1992, the bankruptcy court granted their motion and approved the amendment to the Plan, effectively ending the moratorium. The operative date of the Document 91C amendment was June 30, 1992.

## II.

## A.

Harry Hunt worked as a pilot for Eastern for twenty-four years. He elected to retire effective March 1, 1991, and demands that he be paid a lump-sum benefit for the value of his interest in the Plan as of that date.[29] On February 22, 1991, Eastern's Pension and Insurance Department received his application for benefits, which was signed by Hunt on February 5, 1991. On April 22, 1991, the manager of Eastern's Pension Administration Department, Ms. S.W. Boles,[30] approved Hunt's application and authorized payment of his benefits.[31] Given Eastern's instruction to the actuary that it apply the moratorium to those applications submitted after January 18, 1991, the State Street Bank

---

[29]The parties agree that the value of Hunt's accrued benefit in the Fund as of March 1, 1991, was $352,748.74.

[30]The record does not disclose the relationship between Eastern's Pension and Insurance Department and Eastern's Pension Administration Department. Given the facts before us, we assume that the latter department carried out the policies and directives of the former department.

[31]Hunt's application requested that his lump sum be rolled over into his IRA at Dean Witter Reynolds, Inc. If a lump-sum distribution was rolled over into an IRA or other eligible retirement plan within 60 days, the lump-sum payment would not be included in gross income for the taxable year in which paid. *See* I.R.C. § 402(a)(5), 26 U.S.C. § 402(a)(5) (1991).

and Trust never made any payment to Hunt. Although Hunt is eligible to receive a modified lump-sum benefit and future payments in accordance with the Document 91C amendment, he has refused to elect that option. In addition, Hunt did not select the periodic-payment option nor did he take out a loan from the Plan.

Dissatisfied with the progress of his application, Hunt dispatched four letters, the first by himself and the other three through two different attorneys. He alleges that these letters were sent pursuant to the instructions in Eastern's February 4, 1991, letter to all Eastern pilots. On March 15, 1991, Hunt wrote to Charles G. Dyer, the chairman of Hawthorne, to inquire about the status of his pension.[32] On March 20, 1991, through the first of three attorneys whom Hunt employed in this controversy,[33] he wrote to O'Connor in order to request the most current statement of his account and the most recent financial statement for the Plan "showing [its] assets and liabilities." On July 15, 1991, through a second attorney, he wrote another letter to Dyer of Hawthorne. In that letter, he requested a statement of "the TAC's position on his application," copies of all amendments to the Plan affecting his benefits, an explanation if the TAC were to deny his application, and the name, address, and the forms necessary to file a claim with the Pension Dispute Board if the TAC decided not to pay his lump sum. Hunt also sent a copy of this letter to the then-chairman of the TAC. Finally, on August 19, 1991, the same attorney wrote on Hunt's behalf to O'Connor to request copies of the "amendments to the Plan," an explanation of whether the TAC "had the right to amend the

[32]In this letter, Hunt expressed his extreme dissatisfaction with the moratorium, Hawthorne, and the TAC. He stated among other things: (1) "I have just been informed ... that the proposed moratorium could be extensive." THIS IS COMPLETELY UNSATISFACTORY! (emphasis in original) (2) "[Hawthorne] is administering a Plan that is already funded and in place. It would appear the delays are "stalling tactics' to financially injure [those] participants who were working on January 18." (3) "The proposal that the [TAC] will adopt changes or amend the provisions of the [Plan] after [Eastern] had ceased business is ridiculous. The Plan was established and funded long before the demise of the Airline." (4) "The possibility of offering partial payments or "[Plan] loans' is completely unsatisfactory to me. If I want to borrow money, I go to a bank. Banks lend money, and retirement funds were established to provide retirement benefits to their participants. If the various members need cash then they should apply to a bank,—banks lend money!"

[33]The first lawyer whom Hunt employed wrote the letter of March 20, 1991. The second lawyer wrote the July 15 and August 19, 1991, letters described in the text above. The third lawyer employed by Hunt brought the instant law suit and prosecuted it in the district court and on this appeal; a lawyer in his firm assisted him with this appeal.

[Plan]," and a statement disclosing the number of applications for lump-sum benefits filed since January 18, 1991.[34] Hunt complains that none of his letters were answered.

B.

On February 21, 1992, Hunt filed a complaint in the United States District Court for the Northern District of Florida against the following parties: Eastern, ALPA, Hawthorne, Charles H. Copeland as chairman of the TAC, and O'Connor as partner and agent for the O'Connor law firm. The complaint was a typical "shotgun" pleading.[35] With the exception of Count I, Hunt made only general references to "ERISA," failing to indicate which provision of the statute served as his basis for relief.

The complaint contained six counts or causes of action. Each incorporated the allegations, mostly factual, set out in the first twenty-four paragraphs of the complaint. In those paragraphs, Hunt made essentially the following allegations:

he was a participant in the Plan;

---

[34]On August 23, 1991, in response to a purported "request" by his Congressman, Hunt sent a letter to Mr. Stephen Mayle of the Office of Filings, Information, and Consumer Services of the United States Securities and Exchange Commission. He made, *inter alia,* the following statements: (1) "I believe Mr. Dyer [of Hawthorne] and the [TAC], which is packed with [ALPA] [r]epresentatives, are trying to prevent these lump sum payouts by arbitrarily modifying the retirement agreements so as to prevent the retiree from moving his account to other fund managers or IRA retirement programs of their choice." (2) "I request your expeditious assistance in investigating Mr. Dyer's activities as the Fund Manager to determine if he is in violation of Security and Exchange Commission Rules relating to investment fund managers and request your prompt reply regarding your findings in this matter."

[35]*See, e.g., Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162, 164 (11th Cir.1997); *Anderson v. District Bd. of Trustees,* 77 F.3d 364, 366-67 (11th Cir.1996). As such, the complaint was not the model of clarity and precision necessary to enable the defendants to frame a responsive pleading. The district court would have been within its rights had it stricken the pleading on its own initiative and required a repleader. *Ebrahimi,* 114 F.3d 162 at ----; *Anderson,* 77 F.3d at 367 n. 5; *Cesnik v. Edgewood Baptist Church,* 88 F.3d 902, 907 n. 13 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 946, 136 L.Ed.2d 834 (1997). As we relate *infra,* the court subsequently took such action when Hunt's attorney moved the court for leave to file an amended complaint, which amounted to nothing more than a rehash of the original complaint. The court denied his motion with leave to file an amended complaint that did not suffer from "some of the same infirmities contained in his original complaint." Hunt's attorney thereafter filed an amended complaint, but it constituted no improvement over his original pleading. Unfortunately, rather than striking the amended complaint from the record, the court accepted it. As a result, Hunt's claims remained ambiguous and in part inconsistent, the issues were not properly delineated, and the trial yielded the erroneous decision we set aside today.

on February 5, 1991, he mailed to the Plan administrator's (Eastern's) Pension and Insurance Department a "Notice of Retirement Status, electing a lump sum payout of his benefits under the [Plan], effective on his early retirement date of March 1, 1991";

he inquired of Hawthorne on March 15, 1991, May 3, 1991, and May 7, 1991 as to when he would receive his lump-sum payment for his accrued benefit;

Hawthorne replied that he would be paid between June 15, 1991, and June 30, 1991;

the Plan administrator had not paid his benefit because a moratorium had been placed on the payment of lump-sum benefits;

the "moratorium resulted from resolutions rendered by ALPA"; and

he retained counsel in order to obtain his lump-sum benefit.[36]

Count I of the complaint, titled "Failure to Provide Information," alleged that the defendants' failure "to respond within 30 days to repeated written requests made by Hunt since March 20, 1991, as required by 29 U.S.C. § 1132(c)(1)(B)," rendered the defendants "liable to Hunt in an amount up to $100 per day from the date of this failure to respond pursuant to [section] 1132(c)(1)(B)." Accordingly, Hunt requested "judgment against Defendants for the applicable penalty and damages, ... such further relief as the court deems appropriate and ... prejudgment interest, costs and reasonable attorneys' fees."

Count II, titled "Action to Enforce Rights under [Plan]," alleged that Hunt had properly submitted his request for a lump-sum benefit; that he was entitled to the benefit; and that the "Defendants have failed to pay or direct payment of said benefits and have failed to provide any disposition of Hunt's claim." Accordingly, Hunt asked the court to "enter an order requiring Defendants to pay Hunt his benefits and award to him prejudgment interest, costs and reasonable attorneys' fees."

Count III, titled "Breach of Fiduciary Duty," alleged in pertinent part:

the defendants were fiduciaries under ERISA;

"ALPA has a duty not to interfere with Hunt's interest";

"[t]he value of Hunt's [Plan] account continues to decrease since his effective retirement

---

[36]Hunt also alleged that he "relied on [Hawthorne's] representations [that he would receive his benefits between June 15 and 30, 1991] and on the terms of the Plan in establishing his business and activities following his retirement [from Eastern]."

date";

the defendants "willfully and wantonly breached their fiduciary duty to Hunt by failing to pay [his lump-sum benefit], by failing to respond to Hunt's requests for information, by interfering with Hunt's rights to [his benefit], and by failing to discharge their duties solely in the interest of the participants for the exclusive purpose of providing benefits in accordance with the [Plan] documents";

the decision to impose the moratorium on lump-sum benefits was "arbitrary and capricious, [was] contrary to the terms of the [Plan] and [was] contrary to law"; and

"[a]s a result of Defendants' breach of the fiduciary duties, Hunt has been damaged by failing to receive his lump sum payout and the resulting payment of increased interest expense for loans obtained pending payment."

Accordingly, Hunt demanded "compensatory and punitive damages against Defendants jointly and severally and request[ed] entry of an order awarding to him prejudgment interest, costs and reasonable attorneys' fees."

Count IV, titled "Recovery of Benefits," alleged that "Hunt has been damaged by Defendants' failure to pay Hunt the benefits to which he is entitled under the [Plan]." Accordingly, Hunt demanded "judgment against Defendants jointly and severally for payment of his benefits under the [Plan], plus prejudgment interest, costs and attorneys' fees."

Count V, titled "Estoppel," alleged in pertinent part:

"Defendants represented to Hunt that he was fully vested, that the [Plan] was fully funded, and that his benefits would be paid before June 30, 1991";

"Hunt relied on the terms of the [Plan] and on the representation of Defendants in determining his retirement date and in establishing his business plan and financial affairs upon retirement"; and

"Defendants should be estopped to deny payment and to refuse to process payment to Hunt."

Accordingly, Hunt demanded "judgment against Defendants jointly and severally for payment of his benefits under the [Plan], plus prejudgment interest, costs and attorneys' fees."

Count VI, titled "Declaratory Judgment," alleged that the defendants "failure to pay to Hunt the benefits to which he is entitled as set forth in the [Plan] have raised dispute regarding Hunt's entitlement (right) to immediate payment of the [Plan] benefits under the terms of the [Plan] and ERISA" and that "Chapter 86 Fla. Stat.[ ] provides that such rights may be determined by the court." Accordingly, Hunt requested that "this court enter an order declaring his right to payment of his

lump sum [Plan] benefits under the terms of the [Plan] and pursuant to ERISA and awarding to Hunt costs of this proceeding, including reasonable attorneys' fees."

The defendants, proceeding individually, responded to Hunt's complaint. Hawthorne and the Bankruptcy Trustee, who appeared for Eastern, filed answers that denied liability and included the affirmative defense that the complaint failed to state a claim for relief. The remaining defendants, with the exception of Copeland, moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief;[37] Copeland moved for dismissal on the ground that Hunt had not served him with process as required by Fed.R.Civ.P. 4(j).[38] Because Hunt had "demonstrated neither good reason for Copeland's continued presence in this lawsuit nor good cause for the lack of timely service upon Copeland," the court dismissed Copeland from the case.[39]

Before the court could address the question whether the complaint stated a claim for relief against any of the defendants, the Bankruptcy Trustee moved the district court on August 6, 1992, for summary judgment on the grounds, among others, that Eastern was not a fiduciary under the Plan because its duties were purely ministerial; that Eastern lacked discretion to impose the moratorium; and that the moratorium was imposed at the TAC's direction. Although the Plan contained no provision requiring Eastern to accept the TAC's decisions as binding, Eastern contended that it "had no choice but to abide by" the TAC's decision to impose a moratorium on the payment of lump-sum benefits. Finally, Eastern contended that "its sole obligation in the retirement benefits process is limited to determining eligibility, here whether an applicant meets the age criteria." "Once this is done," Eastern argued, "[it] has no role in deciding *whether* to pay an eligible participant benefits,

---

[37]ALPA filed alternative motions to dismiss and for summary judgment.

[38]Fed.R.Civ.P. 4(j), now Fed.R.Civ.P. 4(m), provided in pertinent part:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion.

[39]The district court issued its order dismissing Copeland from the case on January 4, 1993.

*what* benefits an eligible participant is entitled to, or *how* those benefits will be distributed" (emphasis in original).

On October 1, 1992, while this motion for summary judgment and the Rule 12(b)(6) motions to dismiss were still pending, the Bankruptcy Trustee and ALPA jointly moved the bankruptcy court for the entry of an order pursuant to 11 U.S.C. § 363 approving the Document 91C amendment to the Plan. *See supra* part I.D. Their motion advised the bankruptcy court of the following:

> On July 27, 1992, Eastern and ALPA entered into a letter of agreement to amend the [Plan], conditioned on the approval of this Court. Under the agreement, designated as "Document 91C', the [Plan] would be amended to provide ... for the segregation of the assets of the [Plan] into liquid and illiquid segments, and would modify the distribution of lump-sum benefits under the [Plan].

> Under Document 91C, Eastern would remain both the "Sponsor' and the "Administrator' of the [Plan] for purposes of [ERISA]. Eastern and ALPA have been told that one or more groups object to Document 91C, and may file suit challenging its implementation. Because Eastern's ministerial role in the [Plan] is a continuing obligation of the estate, and to provide a single forum to consider the objections to Document 91C, the [Bankruptcy] Trustee and ALPA hereby jointly seek an Order from this Court approving Document 91C under its authority to approve contracts made by the [Bankruptcy] Trustee other than in the ordinary course of business. *See* 11 U.S.C. § 363.

On October 26, 1992, Hunt, acting through his attorney in the instant case, filed with the bankruptcy court an "Objection to Joint Motion for Entry of Order Approving Amendment to [Plan]." The essence of his objection was that "[t]he movants have failed to provide any authority which would permit amendment of the [Plan] in such a manner that would alter or adversely impact Hunt's ability to receive a lump sum payment upon his retirement." According to Hunt, section 13.1 of the Plan precluded any amendment that would "adversely affect the retirement benefits provided to the participant at the time of the modification." Alternatively, Hunt had "no objection to any amendment that excepts or exempts him, or that otherwise permits him to receive his lump sum payout." Finally, Hunt contended that the bankruptcy court lacked jurisdiction over the administration of the Plan because "Eastern's involvement in the [Plan], according to its own representations, is merely ministerial. The motion seeks to elevate and escalate Eastern's involvement in administering the Plan without providing plan participants with any means of participating in Eastern's administration."

On November 13, 1992, the bankruptcy court held a hearing on the Bankruptcy Trustee's and

ALPA's joint motion for approval of the Document 91C amendment to the Plan. In addressing objections of Plan participants such as Hunt, the court stated the following:

> It is clear from this record that the objections are not well-founded. The record does support the relief that has been requested, which does give equitable treatment to inherent competing interests to the [Plan]. In any situation such as this there are always competing interests. And it is clear from this record that the proposal is equitable.

The bankruptcy court granted the joint motion. According to the Bankruptcy Trustee, neither Hunt nor any other objector appealed this ruling.

On December 4, 1992, following the bankruptcy court's approval of the Document 91C amendment to the lump-sum benefit provision of the Plan, Hunt moved the district court for leave to file an amended complaint. The Bankruptcy Trustee, ALPA, and Hawthorne opposed Hunt's motion in separate filings.[40] The Bankruptcy Trustee and Hawthorne argued that Hunt's motion should be denied on the ground that the bankruptcy court's rejection of Hunt's objection to the approval of the Document 91C amendment barred his claim for a lump-sum benefit. The Bankruptcy Trustee also represented that Hunt "had a full opportunity to address his concerns before the bankruptcy court. Having failed in his efforts before the bankruptcy court, he [was] barred under the doctrine of res judicata from collaterally attacking Document 91C before this [District] Court."[41] ALPA objected to Hunt's proposed amended complaint on the ground that the claims Hunt proposed to assert against it were frivolous.

On February 1, 1993, the district court disposed of three of the pending motions. The first two were ALPA's alternative motions to dismiss Hunt's complaint for failure to state a claim for relief and for summary judgment. The court granted both motions. It concluded that ALPA was not an administrator of the Plan and that Hunt's breach of fiduciary duty claim was improperly asserted; ALPA, therefore, could not have been held liable for any of the relief Hunt sought in Counts I through IV. The court also rejected Hunt's Count V estoppel claim because the complaint failed to

---

[40]Defendants Copeland and O'Connor did not respond to Hunt's motion.

[41]According to the Bankruptcy Trustee, the bankruptcy court heard and rejected Hunt's objection to the approval of the Document 91C amendment on November 13, 1992, and Hunt did not appeal this ruling. Hunt did not contest this representation.

allege that Hunt had relied on a representation made by ALPA.

The third motion disposed of was Hunt's motion for leave to file an amended complaint. The court denied that motion "because ... [the amended complaint Hunt tendered with his motion] suffer[ed] from some of the same infirmities contained in his original complaint." The court did not specify the infirmities in Hunt's original complaint; whatever they were, the court gave Hunt twenty-two days to cure them and to "file an appropriate amended complaint."

C.

On February 24, 1993, Hunt filed an amended complaint. Without obtaining leave of court as required by Fed.R.Civ.P. 21, Hunt dropped from the case four of the defendants named in his original complaint: Eastern, ALPA, Copeland, and O'Connor.[42] He replaced them with two new defendants, the TAC and the Plan, which joined Hawthorne as the defendants in the case. The Bankruptcy Trustee subsequently learned that Hunt had dropped Eastern from the case, and on April 30, 1993, it obtained from Hunt and filed with the court a stipulation that recited:

> Pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure, plaintiff ... Hunt and defendant ... Eastern ... hereby agree and stipulate that the above captioned action shall

---

[42]Fed.R.Civ.P. 21, "Misjoinder and Non-Joinder of Parties," provides in pertinent part: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." A plaintiff who has been given leave to file an amended complaint may drop a defendant from the case without obtaining a Rule 21 order if the defendant has not responded to the original complaint with an answer. *See generally* 3 Moore's Federal Practice, §§ 15.10, 15.11 (3d ed.1997); 4 Moore's Federal Practice, § 21.02[5][b] (3d ed.1997) (discussing the interrelationship of Rules 15 and 21 of the Federal Rules of Civil Procedure). ALPA and O'Connor did not answer Hunt's original complaint; ALPA filed alternative motions to dismiss and for summary judgment, and O'Connor filed a motion to dismiss. Hunt, therefore, was not required to file a Rule 21 motion and obtain an order dismissing those defendants from the case. Eastern, however, answered Hunt's original complaint; consequently, Hunt could not drop Eastern from the case without moving the court pursuant to Rule 21 for an order dismissing Eastern "on such terms as are just." Hunt was free, however, to obtain Eastern's dismissal from the case by filing with the court a stipulation under Fed.R.Civ.P. 41(a)(1)(ii). As we observe above and in part III.B, *infra,* Hunt eventually followed this route, obtaining Eastern's dismissal by entering into a stipulation providing for the dismissal of his claims against Eastern with prejudice.

We note that Hunt did not move the court pursuant to Rule 21 to add the TAC and Plan as defendants. Neither party objected to being added, and thus the matter is not an issue here.

be and hereby is dismissed with prejudice as to Eastern, each party to bear its own costs.[43]

Hunt's amended complaint contained seven counts. With the minor exceptions set out in the margin, the first six counts of the amended complaint simply replicated the allegations and prayers for relief contained in the original complaint. For example, as before, Count I was titled "Failure to Provide Information"; Count II was titled "Action to Enforce Rights under [Plan]"; Count III was titled "Breach of Fiduciary Duty"; Count IV was titled "Recovery of Benefits"; Count V was titled "Estoppel"; and Count VI was titled "Declaratory Judgment."[44]

---

[43]The Bankruptcy Trustee's attorney and Hunt's attorney signed the stipulation on April 22, 1993, and April 29, 1993, respectively.

[44]The principal difference between the two complaints was that instead of seeking recovery from the parties named as defendants in the original complaint, the counts of the amended complaint sought relief only from the defendants named in the amended complaint. Other than this difference, the "amended" Count I was an exact duplicate of the original Count I. Count II added the following allegation, which was implicit in the allegations of the original Count II: "These defendants have improperly, and without authority, interfered with Hunt's attempts to receive payment through the imposition of a moratorium, or modification and amendment of the [Plan]."

Count III, the breach of fiduciary duty claim, added the allegations listed below in an attempt to circumvent the dismissal of this claim on the ground that an individual plan participant lacks standing under ERISA to sue a plan fiduciary for money damages. That Hunt lacked standing as a plan participant to bring a breach of fiduciary duty claim against the TAC had previously been brought to the district court's attention, and the court had informed his attorney that Hunt could not bring the claim for his own benefit, as opposed to the benefit of all participants. As Hunt's attorney well knew, the right to sue for breach of fiduciary duty belonged to *all* of the plan's participants as a group. *See Massachusetts Mut. Life. Ins. Co. v. Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985) (finding that recovery for breach of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, "inures to the benefit of the plan as a whole"). In an effort to shore up the original Count III and persuade the district court to accord him standing for the breach of fiduciary claim, Hunt alleged:

The [Plan] itself is effectively precluded from challenging the fiduciary duties of these defendants in that these defendants are inextricably tied to the [Plan] itself through their roles, activities, insured interests and administration of the [Plan]. Hunt has no other recourse for the actions of these fiduciaries with regard to his interest in the [Plan].

Defendants have willfully and wantonly breached their fiduciary duty to Hunt *and to the [Plan] itself,* by failing to pay [Plan] benefits to Hunt, by failing to respond to Hunt's requests for information, by interfering with Hunt's rights to these monies, and by failing to discharge their duties solely in the interest of the participants for the exclusive purpose of providing benefits in accordance with the [Plan] documents (emphasis added).

In the original complaint, twenty-four paragraphs preceded the presentation of the counts. The amended complaint had twenty-five such paragraphs. These paragraphs, compared to their counterparts in the original complaint, differed materially in the following way. After alleging in the original complaint that the Document 91C amendment affecting Hunt's lump-sum benefit had been made by Eastern and ALPA, which were no longer parties in the case, Hunt changed his position and alleged that the TAC, which "renders decisions regarding administration of the [Plan]," was the party responsible for the moratorium rather than Eastern or ALPA. According to Hunt, Eastern and ALPA were "the only entities which can act to amend or modify the [Plan]"; he therefore implied that the moratorium allegedly imposed by the TAC constituted an unauthorized amendment or modification of the Plan.

As noted, the amended complaint added a seventh count to those asserted in the original complaint. Count VII, titled "Injunctive Relief," alleged essentially that the defendants had breached their duty to maintain sufficient "reserves" with which to pay Hunt's lump-sum benefit. It alleged further that

[n]o other parties will be prejudiced by enjoining the imposition of the moratorium,

The new Count III also added this allegation, which followed the replicated allegation that the moratorium was "arbitrary and capricious, [was] contrary to the terms of the [Plan], and [was] contrary to law":

Alternatively, if the moratorium was imposed because of the [Plan's] inability to pay lump sum benefits to retiring employees electing that option, then these Defendants have breached their fiduciary duties to the [Plan] and to Hunt through mismanagement and failure to take such action to ensure that the [Plan] was adequately funded so as to pay the lump sum benefit option exercised by Hunt.

Finally, the new Count III added this language to its prayer for compensatory and punitive damages: "[I]n the alternative, [Hunt] demands judgment for damages on behalf of the [Plan] in an amount sufficient to fully fund the retirement benefits authorized under the [Plan]."

The sole addition of note to new Count IV was the allegation that the moratorium and the Document 91C amendment to the lump-sum benefit provision, which the bankruptcy court had approved, were "arbitrary, capricious, unreasonable and [ ] contrary to the provisions of the [Plan]." New Count V, the estoppel claim, added the allegation that the defendants were estopped from enforcing against Hunt the moratorium or the Document 91C amendment. Count VI, the declaratory judgment claim, was renewed verbatim.

modification or amendment or payments made thereunder beyond keeping sufficient reserves for the payment of Hunt's lump sum benefit; i.e., payments would continue under the [Plan], but defendants would be enjoined from so depleting the liquid portion of the fund that Hunt's total lump sum benefit could be paid.

Accordingly, Hunt "demand[ed] that [the] Court enter an order enjoining payment of benefits under the [Plan] to current beneficiaries, at least to the extent that sufficient funds are retained to pay Hunt's lump sum benefit, interest, costs and attorney's fees."

The TAC and the Plan jointly moved the court to dismiss the counts of the amended complaint on the ground that none stated a claim for relief.[45]  In part, they repeated the arguments previously addressed to the sufficiency of Hunt's original complaint and advanced in the Bankruptcy Trustee's and ALPA's objections to Hunt's motion for leave to file an amended complaint.  These arguments included the claim that Hunt lacked standing to sue for breach of fiduciary duty and that the moratorium and the bankruptcy court's approval of the Document 91C amendment foreclosed his claim.  As for Hunt's claim seeking the $100 per day statutory penalty, these defendants contended that such penalties were assessable only against the administrator of the Plan, Eastern, which had been dismissed from the case with prejudice.  Hawthorne answered the complaint with a general denial of liability.

The district court disposed of the joint motion to dismiss the amended complaint in the following manner:  the court (1) denied the motion to dismiss Count I;  (2) denied the motion to dismiss Count II;  (3) dismissed Count III to the extent that it sought comprehensive and punitive damages for Hunt, but held that he had standing to sue the TAC for breach of fiduciary duty on behalf of the Plan's participants;  (4) denied the motion to dismiss Count IV;  (5) dismissed Count V after Hunt conceded that he had no case for estoppel;  (6) dismissed Count VI on the ground of ERISA preemption;  and (7) denied the motion to dismiss Count VII, although the court was unable to discern—from what it described as an "inartfully" drafted pleading—whether Hunt stated a claim for relief.

Following these rulings, the TAC and the Plan answered the amended complaint, denying

---

[45]The TAC and the Plan were represented by the same counsel throughout this case.

liability, and then jointly moved for summary judgment. Their motion essentially restated the arguments presented in their motion to dismiss. Hawthorne also moved for summary judgment. It contended, among other things, that Hunt's claim for the lump-sum benefit (Counts II and IV) could be brought only against the Plan and a person or entity, such as the Plan administrator, possessing the authority to order the payment of his benefit. Hawthorne argued that it had no such authority and, thus, could not provide the relief sought. In addition, Hawthorne contended that it could not be held liable for breach of fiduciary duty (Count III) because the Plan, the appropriate plaintiff for such a cause of action, was not injured by the failure to pay Hunt his lump-sum benefit.

The court deferred ruling on these motions for summary judgment until the morning that the trial of the case began. In the meantime, Hawthorne settled with Hunt and agreed to the entry of judgment in favor of Hunt on Count I in the sum of $10,000; all other counts against Hawthorne were to be dismissed with prejudice. The court denied the only motion that was pending, the TAC's and the Plan's motion for summary judgment, and the trial commenced.

## D.

The case was tried to the court. Five counts from the amended complaint were at issue: Hunt's claim for the $100 per day statutory penalty under Count I; his identical claims under Counts II and IV seeking judgment in the amount of the lump-sum benefit, prejudgment interest, costs, and attorneys' fees; his claim on behalf of the Plan participants for breach of fiduciary duty under Count III; and his request that the TAC and the Plan be enjoined from paying benefits to other participants until they satisfied his claim under Count VII.

After considering the evidence adduced by the parties, the court, in an "Order Directing Entry of Judgment," held as follows:

*Count I.* The court found that only designated plan administrators are subject to the $100 penalty imposed by ERISA § 502(c), 29 U.S.C. § 1132(c), for failing to respond to a plan-participant's requests for information as required by the statute. Because Hunt had neither established that the TAC was the Plan administrator nor that it had assumed the "information-providing function" of the administrator, the TAC could not be held liable under

section 502(c).

*Counts II and IV.* The court first found that Hunt had properly applied for the lump-sum benefit and that his application had been denied because of the moratorium the TAC had "imposed" unilaterally. The TAC had done so because it concluded that a "moratorium was needed to maintain the financial integrity of the [Plan] and to protect the economic interests of all plan participants and beneficiaries." The court then turned to the question whether the TAC had the authority to impose the moratorium for such purpose. Although the Plan did not expressly give the TAC such authority, the court assumed that the common law of trusts did so. Having made that determination, the court addressed the question whether Hunt or the TAC had the burden of proof regarding the need for the moratorium: it concluded that the TAC had the burden.

With this ruling in hand, the court considered whether the TAC's proof established that "its action was both prudent and necessary to protect the interests of all plan participants and their beneficiaries." The court held that although the moratorium may have been justified, the TAC's proof was insufficient to carry the day. The court therefore gave Hunt judgment on Counts II and IV in the sum of $352,748.74 plus costs.

*Count III.* The court's findings on this claim are ambiguous. Hunt had alleged that "if the moratorium was imposed [by the TAC] because of the [Plan's] inability to pay lump sum benefits to retiring employees electing that option, then these Defendants have breached their fiduciary duties to the [Plan] and to Hunt through mismanagement and failure to take such action to ensure that the [Plan] was adequately funded so as to pay the lump sum benefit option exercised by Hunt." *See supra* note 44. In other words, the TAC breached its fiduciary duty to the Plan's participants, and therefore to Hunt, by imposing the moratorium because of its inability to pay the lump-sum benefits.

The court found no such breach: "Hunt submitted neither evidence of mismanagement nor—assuming, for the sake of argument, that he proved a breach of fiduciary duty—evidence from which this court could fashion a remedy. Hunt having thus failed to satisfy his burden of proof on Count III, judgment will be entered in favor of the defendants."

Therefore, under the district court's analysis, whether the TAC had breached its fiduciary

duty to the Plan participants, including Hunt, by imposing the moratorium turned on which party had the burden of proof. On Counts II and IV, the court held that the TAC had the burden but failed to sustain it by showing that prudence required that a moratorium be imposed. On Count III, the court held that Hunt had the burden of proof but failed to show that the TAC had acted imprudently in imposing the moratorium.[46]

The district court's "Order Directing Entry of Judgment" makes no mention of the remaining count (Count VII). After disposing of the other counts in the amended complaint by number, including Counts V and VI which were dismissed from the case prior to trial, the court instructed the clerk of court in paragraph four of its order ("paragraph 4") how judgment should be entered: "4. On the remaining counts [i.e., Counts II, IV, and VII], the clerk shall enter judgment in favor of Harry L. Hunt in the amount of $352,748.74 plus costs. The judgment shall be paid from the [Plan] [F]und." We read this language, and the final judgment entered by the clerk, as disposing of Count VII in favor of Hunt,[47] although the court did not grant the injunctive relief the count requested.[48]

Following the entry of final judgment, the TAC and the Plan appealed the district court's judgment on Counts II and IV. Hunt cross-appealed the court's judgment on Count I but not Count

---

[46]How the court could assume, "for sake of argument, that [Hunt] proved a breach of fiduciary duty" and then deny him relief on Count III is a question that the court's dispositive order does not answer.

[47]By treating the district court's final judgment as having terminated Count VII of Hunt's amended complaint, we have a final judgment before us that is appealable under 28 U.S.C. § 1291 because the judgment has adjudicated all claims against all parties. *See, e.g., Penton v. Pompano Constr. Co.,* 963 F.2d 321, 321-22 (11th Cir.1992). Hunt's amendment of his complaint, which deleted ALPA and O'Connor from the action, operated to dismiss those parties from the suit. *See supra* note 42. The amendment, however, did not operate to dismiss Eastern from the case. *Id.* Rather, Eastern was dismissed from the case, with prejudice, when Hunt and Eastern executed a stipulation of dismissal and filed it with the court. *See Oswalt v. Scripto, Inc.,* 616 F.2d 191, 194-95 (5th Cir.1980). In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[48]The district court, despite deciding *sub silentio* Count VII in Hunt's favor, granted him no relief on this count. In their briefs, the parties have ignored Count VII altogether; like the district court, they made no mention of it. Because of our disposition of Hunt's explicit claim for benefits contained in Counts II and IV, Count VII falls by the wayside. That is to say, we vacate the court's judgment on Count VII and direct the court to enter judgment in favor of the TAC and the Plan on that count.

III. For the reasons that follow, we reverse the court's judgment on Counts II and IV, and affirm as to Count I.

III.

Paragraph 4 of the district court's "Order Directing Entry of Judgment," which gave Hunt judgment on Counts II, IV, and VII for the lump-sum benefit, presents several threshold issues that must be resolved before we can consider the merits of his claim to that benefit. As stated previously, in paragraph 4, the court directed the clerk to "enter judgment in favor of [Hunt] in the amount of $352,748.74 plus costs. The judgment shall be paid from the [Plan] [F]und."[49]

The first threshold question is whether the relief granted in paragraph 4 is legal or equitable;[50] that is, does the relief granted constitute a money judgment or an *in personam* order directing the TAC or the Plan to pay Hunt a sum of money from the assets of the Plan's Fund. The answer to this question is important because, as we explain below, the relief provided in an action to recover benefits under ERISA is equitable, not legal. More specifically, the relief consists of an order directing a person or entity having the necessary authority under the benefit plan to pay the participant the benefit that he seeks. Hunt sought such equitable relief in Count II of his amended complaint, asking the district court to enter "an order requiring Defendants to pay Hunt his benefits." In Count IV, Hunt sought legal relief, demanding "judgment against Defendants ... jointly and severally for payment of his benefits." In Count VII, titled "Injunctive Relief," Hunt asked the court to "enter an order enjoining payment of benefits ... to current beneficiaries, at least to the extent that sufficient funds are retained to pay Hunt's lump sum benefit."

Nothing in the language of paragraph 4 orders the TAC to do anything. If, however, we construe—that is, effectively rewrite—paragraph 4 so that it orders the TAC to pay the benefit from the Fund,[51] then we must decide whether the TAC has the authority under the Plan to effect payment;

---

[49]We note that the final judgment entered by the clerk quoted this language verbatim.

[50]If the relief granted in paragraph 4 is equitable, we have jurisdiction to review the grant under 28 U.S.C. § 1292(a)(1). *See supra* note 47.

[51]In his original complaint, of course, Hunt took the position that Eastern, as Plan administrator, was the party having the authority to effect payment of the benefit he is seeking;

if not, the TAC cannot provide the relief sought. Despite its representations to the contrary, Eastern, the Plan administrator, obviously could effect payment if ordered to do so, *see supra* part I.C and *infra* part III.B, but Hunt voluntarily dismissed it from the case with prejudice. Nor can the Plan as an entity provide any relief; the Plan alone is simply a written instrument executed by Eastern and ALPA.

We turn now to these issues, taking them up in order.

A.

Section 502(a)(1)(B) of ERISA provides that "[a] civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). On its face, this language does not indicate whether a participant seeking to recover retirement benefits may obtain legal or equitable relief. Although the "causes of action authorized by section 502(a)(1)(B) [of ERISA] are not explicitly denominated as equitable," *see Pane v. RCA Corp.,* 868 F.2d 631, 636 (3d Cir.1989),[52] this circuit has treated actions to recover benefits under section 502(a)(1)(B) as equitable in nature. *See, e.g., Shannon v. Jack Eckerd Corp.,* 113 F.3d 208, 209-10 (11th Cir.1997) (denying appeal of district court's judgment ordering plan administrator to pay benefits to plan participant); *Godfrey v. BellSouth Telecomm., Inc.,* 89 F.3d 755, 756-57 (11th Cir.1996) (affirming district court's issuance of "an injunction ordering [Plan administrator] to comply with ERISA and pay [participant] ... benefits"). This position is consistent with our view that participants suing under section 502(a)(1)(B) are not entitled to a jury trial. In *Blake v. Unionmutual Stock Life Ins. Co. of America,* we reasoned:

---

this was his reason for naming Eastern as a party defendant in his claims to recover his lump-sum benefit. Since eliminating Eastern from his amended complaint as a party defendant, Hunt has taken the position that the TAC, not Eastern, is the entity having the authority to effect payment of the benefit.

[52]In *Pane,* the Third Circuit aptly captured the distinction between legal and equitable relief in the context of an action brought under section 502(a)(1)(B) of ERISA: "A legal remedy would result in a money judgment enforceable only by execution, or other conventional common law process such as ejectment or replevin. An equitable remedy would result in a judgment enforceable *in personam* and by contempt." 868 F.2d at 635-36.

> The nature of an action under section 502(a)(1)(B) is for the enforcement of the ERISA plan. Although the plaintiffs assert that they are claiming money damages, in effect they are claiming the benefits they are allegedly entitled to under the plan. Although ... a money judgment would satisfy their demands, ... only an order for continuing benefits would be sufficient. This is traditionally equitable relief....

906 F.2d 1525, 1526 (11th Cir.1990). This view accords with the majority of circuits that have considered this issue.[53] We therefore hold that Hunt's claim for legal relief (i.e., a money judgment) under section 502(a)(1)(B) fails to state a claim. Accordingly, we dismiss Count IV of Hunt's amended complaint, leaving only his claim for equitable relief in Count II to recover his lump-sum benefit.

Given the equitable nature of Hunt's recovery-of-benefits claim under ERISA, we also find that an *in personam* order enjoining the payment of benefits under section 502(a)(1)(B) must be directed to a person or entity other than the plan itself. While ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1), does state that "[a]n employee benefit plan may sue or be sued ... as an entity," nothing in ERISA permits the district court to issue an injunctive order solely against the plan.[54] Rather, the case law of this circuit demonstrates that an order enjoining the payment of benefits from an ERISA plan must issue against a party capable of providing the relief requested. *See, e.g., Shannon,* 113

---

[53] *See Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d 820, 829 (7th Cir.1980) ("We conclude that Congress' silence on the jury right issue reflects an intention that suits for pension benefits by disappointed applicants are equitable."), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *see also Sullivan v. LTV Aerospace and Defense Co.,* 82 F.3d 1251, 1258-59 (2d Cir.1996); *Berry v. Ciba-Geigy Corp.,* 761 F.2d 1003, 1007 (4th Cir.1985); *Turner v. CF & I Steel Corp.,* 770 F.2d 43, 47 (3d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *In re Vorpahl,* 695 F.2d 318, 321-22 (8th Cir.1982); *Calamia v. Spivey,* 632 F.2d 1235, 1237 (5th Cir. Unit A 1980). Some district courts have suggested that *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), calls these holdings into doubt. *See, e.g., Hulcher v. United Behavioral Sys.,* 919 F.Supp. 879, 885 (E.D.Va.1995) (holding that "action to recover [ERISA] benefits under the subject plan are legal in nature" and that "[p]laintiff is constitutionally entitled to trial by jury on any claim raised under § 1132(a)(1)(B)"); *Vaughn v. Owen Steel Co.,* 871 F.Supp. 247, 250-51 (D.S.C.1994) (finding that section 502 claim under ERISA is analogous to state law contract claim and must be tried before jury). None of the courts of appeals mentioned above, however, have endorsed the reasoning of these district courts.

[54] ERISA § 502(d)(2) states that "[a]ny money judgment ... against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity." 29 U.S.C. § 1132(d)(2). This provision contemplates legal relief and does not apply to an action to recover benefits under section 502(a)(1)(B).

F.3d at 209-10; *Godfrey,* 89 F.3d at 756-57; *cf. Fisher v. Metro. Life Ins. Co.,* 895 F.2d 1073, 1074 (5th Cir.1990) (affirming district court's dismissal of plaintiff's second amended complaint in part for failure to name the plan administrator as an "indispensable party"). We therefore reject the notion that an injunctive order to pay benefits under section 502(a)(1)(B) of ERISA can issue solely against an ERISA plan as an entity.

B.

We next examine the district court's ruling in paragraph 4 that "the clerk shall enter judgment in favor of Harry L. Hunt [on Counts II, IV, and VII]" and that "[t]he judgment shall be paid from the [Plan] fund." Because an injunctive order cannot issue against the Plan itself, we assume that we have discretion to construe—i.e., effectively rewrite—paragraph 4 so that it directs the TAC to pay Hunt the lump-sum benefit from the Fund.

Our review of the record and the Plan,[55] however, makes clear that the TAC has no authority under the Plan to issue or deny payment of a lump-sum benefit to a participant. Rather, the TAC has limited powers under the Plan[56] and plays no role in the process of reviewing applications for retirement benefits. Unlike Eastern, the TAC's authority is primarily limited to the management and supervision of the Fund's assets. Its "overall supervisory responsibility" is restricted to the "administrative functions of the Fund," *see* § 2.13(b)(i) ("Fund Administration"), and its duty to the Plan is limited "to maintain[ing] surveillance over the status and administration of the Plan and the [Fund]," *see* § 10.2(b) ("Rights and Duties of the [TAC]").

In addition, as discussed in part I.B, *supra,* the TAC must exercise its limited powers in a manner consistent with its obligations to ALPA. For example, before selecting and replacing investment advisors and trustees, the TAC must notify ALPA of its planned course of action and

---

[55]Unless otherwise specified, the term "Plan" in part III refers to the written instrument in effect at the time Hunt's application was "approved" on April 22, 1991 (i.e., Documents 91 and 91A).

[56]We review the relevant provisions of the Plan here because a named fiduciary must discharge its duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

give ALPA an opportunity to respond. *See* § 2.7(b) ("Trust Agreement and Trustee"). Similarly, before giving any notice or instruction to a trustee of the Fund, the TAC must serve a copy of the trust direction on ALPA and give it fifteen days to object to the TAC's proposed direction. *See* § 2.8 ("Directions to Trustee(s)). In addition, the TAC must "regularly and periodically suppl[y]" information to ALPA about transactional detail, cash flow reports, investment status, documentation and Fund performance," *see* § 2.11 ("Information and Accountability"), and furnish to ALPA and Plan participants reports about the TAC's "functions, actions, and decisions ... as are reasonable and appropriate," *see* § 10.2(c).

In stark contrast, the plain language of the Plan gives Eastern broad discretion as administrator to make decisions for the Plan. The Supreme Court has stated that a plan administrator has a "statutory responsibility [under ERISA] ... to run the plan in accordance with the currently operative, governing plan documents." *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 84, 115 S.Ct. 1223, 1231, 131 L.Ed.2d 94 (1995). Section 2.2(a) of the Plan confers upon Eastern "those powers necessary to carry out the day to day operation of the Plan." Its responsibilities include the authority to "initially determine all questions arising from the administration, interpretation, and application of the Plan pursuant to all applicable law, agreements and contracts, and such determination shall be binding upon all persons, except as otherwise provided by law, and further provided that each Participant shall be granted the same treatment under similar conditions." *Id.* The Plan also charges Eastern with the responsibility for, *inter alia,* keeping records, *see* § 2.4 ("Records"), preparing and distributing periodic Plan summaries, *see* § 2.5 ("Plan Summary"), and sending to each participant an annual statement reflecting the value of his investment in the Plan, *see* § 2.6 ("Annual Statement").

More important, based on the record before us,[57] we find that Eastern exercises ultimate authority in determining whether a participant should receive payment of his benefit. The record

---

[57]As stated in part I.C and note 12, *supra,* the Plan does not set forth the procedure for processing claims for retirement benefits. This account of the claims-processing procedure is taken from the affidavit and deposition of Charles Dyer of Hawthorne and the affidavit of Brian White, who served as Director of the Eastern Pension and Insurance Department. Both accounts of Eastern's claims-processing procedure are virtually identical.

reveals that Eastern plays the central role in the process of reviewing applications for benefits. The Plan makes Eastern responsible for providing the benefit-application forms to participants. *See* § 12.9(a) ("Application for Benefits").[58] A pilot seeking a lump-sum payment must complete the necessary paperwork and inform an Eastern management employee, the Chief Pilot, of his intention to retire. The Chief Pilot checks the pilot's eligibility under the Plan, and then informs the Eastern Pension and Insurance Department about the pilot's decision to retire.[59] The application is then presented to the Eastern Pension Administration Department, which must provide an authorizing signature beneath a line that states: "The above information is approved and the appropriate allocation from the Plan to provide the benefit payable is hereby authorized." If the application is approved, the Eastern Pension and Insurance Department contacts the Plan's actuary, which determines the precise amount of benefits to which the retiring participant is entitled. The actuary then gives that information to the State Street Bank & Trust, which makes the distribution to the participant. Eastern is responsible for establishing and maintaining a procedure for giving the participant written notification if the application is denied. *See* § 2.3 ("Notification of Denial of Benefits"). If there is a legal dispute as to the proper recipient of a benefit, Eastern may withhold payment pending final determination of the proper beneficiary. *See* § 12.10 ("Beneficiary Dispute").

The facts of this case support our reading that Eastern, not the TAC, has the authority to order payment of retirement benefits. First, the record makes clear that Eastern retained its authority as administrator at all times during the events giving rise to this litigation. When Hunt's application was "approved" by Eastern's Pension Administration Department on April 22, 1991, Eastern was listed in the written instrument as the Plan administrator.[60] When the Plan was amended effective June 25, 1991, Eastern continued to serve as administrator for all aspects of the Plan, with the

---

[58]Section 12.9 also states that each participant "shall ... furnish the Administrator with such documents, evidence, data, or information in support of such application as the Administrator shall consider necessary or desirable."

[59]As stated in part I.D, *supra,* after the moratorium began, the retiring participant would contact Eastern's Pension and Insurance Department directly rather than go through the Chief Pilot.

[60]At this time, the Plan consisted of Document 91 and Document 91A.

exception of the newly introduced periodic-payment option and the provision for Plan loans. *See* § 6.11(f) ("Periodic Payments"), Article XV ("Plan Loans").[61] Even after the Plan was amended effective June 30, 1992, with the bankruptcy court's approval of Document 91C, Eastern retained its authority as Plan administrator.

Second, the record demonstrates that Eastern, despite its representations to the contrary, made the decision to honor the moratorium and ultimately prevented the State Street Bank and Trust from issuing a lump-sum payment to Hunt. As noted in part I.D, *supra,* the director of Eastern's Pension and Insurance Department stated that the process for reviewing benefit claims after the shutdown "basically remained the same, except that ... Eastern would inform Mercer [the Plan actuary] whether a participant had applied for benefits following shutdown, thus implicating the lump-sum moratorium." By this statement, Eastern effectively admits that it ratified the imposition of the moratorium and thus denied Hunt's application. In essence, Eastern's order to the actuary to halt the processing of Hunt's application foreclosed the State Street Bank and Trust from issuing him a benefit check.

Furthermore, there is nothing in the record to indicate that Eastern challenged the legality of the moratorium after its imposition. Eastern's inaction is especially glaring when one considers that Article XIII of the Plan, titled "Modification, Suspension or Discontinuance," vests Eastern with the exclusive authority to modify, suspend or discontinue a feature of the Plan:

> Eastern expects to continue the Plan indefinitely, but *necessarily reserves the right to modify, suspend or terminate it at any time including, but without limiting the generality of the foregoing, discontinuance of the contributions of Eastern under the Plan or modification, suspension, or discontinuance in its entirety or with respect to any feature thereof.* However, any modification, suspension, or discontinuance shall not adversely affect the retirement, death or termination benefits already provided at that time under the Plan for any Participant, contingent annuitant, or beneficiary as of the date of such modification, suspension, or discontinuance. In the event the Plan shall be discontinued, such action shall be taken as shall insure to the extent possible the satisfaction of all liabilities to Participants, contingent annuitants, and beneficiaries that have accrued under the Plan.

§ 13.1 ("General") (emphasis added). Although this provision enumerates only one specific application of this subsection (i.e., the discontinuation of Eastern's contributions), the phrases

---

[61]This version of the Plan included the amendment referred to as Document 91B.

"including, but without limiting the generality of the foregoing" and "with respect to any feature thereof" would encompass other scenarios, such as the suspension of the lump-sum payment option. Thus, if Eastern wanted to challenge the TAC's purportedly "unilateral" imposition of the moratorium, the Plan certainly gave Eastern the authority to do so.[62]

It is clear that Eastern, not the TAC, bears ultimate responsibility for the denial of Hunt's lump-sum benefit. Hunt, however, in an obvious attempt to avoid the effect of the bankruptcy court's approval of the Document 91C amendment, voluntarily dismissed Eastern with prejudice as a party to this action pursuant to Fed.R.Civ.P. 41(a)(1)(ii) shortly after filing his amended complaint.[63]

Nevertheless, the district court ruled in paragraph 4 of its order that the TAC possessed the authority to issue payment from the Fund. In so ruling, the district court implicitly rewrote the Plan to give the TAC that power. Although we recognize that the "principal object of [ERISA] is to protect plan participants and beneficiaries," *Boggs v. Boggs,*, --- U.S. ----, ----, 117 S.Ct. 1754, ----, 138 L.Ed.2d 45, we agree with the First Circuit's admonition that "courts have no right to torture

---

[62]Hunt suggests that the moratorium on lump-sum payments was impermissible because it was inconsistent with § 13.1's provision that "any modification, suspension, or discontinuance shall not adversely affect the retirement, death or termination benefits already provided at that time under the Plan for any Participant." We note, however, that the moratorium on lump-sum payments had no effect on Hunt's actual interest in the Plan—i.e., the total number of annuity units in his accrued benefit; rather, the moratorium only changed the manner in which Hunt and other similarly situated participants could receive their benefits.

> Given the Plan's status as a defined contribution plan, the value of a participant's interest in the Plan fluctuates with the performance of the Fund's assets. *See supra* part I.B. After all, the full name of the Plan is the "Variable Benefit Retirement Plan for Pilots": a participant's interest in the Plan depends not only on the contributions made but also on how the Fund's assets perform.

[63]Eastern's dismissal from the case with prejudice operated as an adjudication on the merits in favor of Eastern on all claims Hunt had brought against the company. *Citibank, N.A. v. Data Lease Fin. Corp.,* 904 F.2d 1498, 1501-02 (11th Cir.1990) ("[A] stipulation of dismissal with prejudice ... at any stage of a judicial proceeding, normally constitutes a final judgment on the merits which bars a later suit on the same cause of action.") (citation omitted). This adjudication by dismissal would include, of course, Hunt's claims (1) that Eastern, as the administrator and as a fiduciary under the Plan, breached its obligation to Hunt and other Plan participants by declaring, or ratifying the TAC's declaration of, the moratorium, and (2) that Eastern wrongfully refused to pay Hunt the lump-sum benefit he seeks. In this appeal, the TAC and the Plan have not argued that this disposition of Hunt's claims against Eastern had a preclusive effect on Hunt's claims against them. Accordingly, we do not consider the issue.

language in an attempt to force particular results.... To the exact contrary, straightforward language in an ERISA-regulated insurance policy should be given its natural meaning." *Burnham v. Guardian Life Ins. Co.,* 873 F.2d 486, 489 (1st Cir.1989) (citation omitted). *See also Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74, 78 (3d Cir.1991) ("While ERISA was enacted to provide security in employee benefits, it protects only those benefits provided in the plan.... ERISA mandates no minimum substantive content for employee welfare benefit plans, and therefore a court has no authority to draft the substantive content of such plans.") (citation and quotation marks omitted), *cert. denied,* 503 U.S. 938, 112 S.Ct. 1479, 117 L.Ed.2d 622 (1992); *cf. Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986) (written employee benefit plans governed by ERISA may not be modified by oral agreements). We therefore reject the district court's *sub silentio* revision of the Plan which enabled the court to direct the TAC to pay Hunt his lump-sum benefit.

C.

Given the district court's view that the TAC denied Hunt's lump-sum benefit by issuing the moratorium, however, we will assume *arguendo* that the TAC could order the State Street Bank and Trust to issue Hunt payment from the Fund. For the district court's theory of liability to make sense, the TAC would necessarily have acted as *de facto* Plan administrator in Eastern's stead; as discussed above, this theory is inconsistent with the Plan and clearly unsupported by the record. Yet, even if we indulge the assumption that the TAC functioned as *de facto* administrator, we remain convinced that the facts of this case justified the imposition of the moratorium and the concomitant denial of Hunt's lump-sum benefit.[64]

When evaluating a plan administrator's decision to deny benefits, a district court must first determine the appropriate standard of review. *Firestone v. Bruch* holds that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility or to construe the

---

[64]In its analysis, the district court assumed that the common law of trusts gave the TAC the power to impose the moratorium. We need not make this assumption for this hypothetical scenario, however, because Article XIII of the Plan clearly gives the administrator the authority to impose a moratorium.

terms of the plan." 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). We have interpreted *Firestone* to mandate an arbitrary and capricious standard of review, which is often used interchangeably with an abuse of discretion standard, if the administrator has discretionary authority to make eligibility determinations or to construe disputed terms of the plan. *See Jett v. Blue Cross and Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir.1989). To trigger this standard of review, the language conferring discretion on the administrator must be "express language unambiguous in its design." *Kirwan v. Marriott Corp.,* 10 F.3d 784, 789 (11th Cir.1994) (internal citations omitted). If the administrator suffers from a conflict of interest in rendering its determination, the district court should apply a heightened arbitrary and capricious standard. *See Firestone,* 489 U.S. at 115, 109 S.Ct. at 957; *see also Marecek v. BellSouth Telecomm.,* 49 F.3d 702, 705 (11th Cir.1995).

The arbitrary and capricious standard is the appropriate standard of review in this case because the Plan contains express language conferring discretionary authority upon the administrator to construe its terms. Under section 2.2(a) ("Administration"), the administrator enjoys the authority to "initially determine all questions arising from the administration, interpretation, and application of the Plan pursuant to all applicable law, agreements and contracts, and such determination shall be binding upon all persons, except as otherwise provided by law." We have held that comparable language is sufficient to trigger review under the arbitrary and capricious standard. *See Jett,* 890 F.2d at 1139 ("[Plan administrator] has the exclusive right to interpret the provisions of th[is] Plan, so its decision is conclusive and binding."); *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 38-39 (11th Cir.1989) ("[Administrator has] full power to construe the provisions of [the] Trust"). Thus, we apply the arbitrary and capricious standard of review to the TAC's "decision" as *de facto* administrator to deny Hunt's lump-sum benefit. We stress that our principal inquiry in this hypothetical situation is not whether the TAC was justified in imposing the moratorium, but whether the TAC was justified in denying Hunt's application for a lump-sum benefit. Of course, our analysis of the latter issue necessarily implicates the former.

Under the arbitrary and capricious standard of review, the court seeks "to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the

administrator at the time the decision was made." *Jett,* 890 F.2d at 1139. The facts presented at trial bear out that the TAC acted reasonably in its decision as *de facto* administrator to impose the moratorium on lump-sum payments. First, the record paints an extremely bleak picture for the Plan in January 1991. It is undisputed that the Plan was low on liquid assets as of the eighteenth of that month. Following the commencement of the Chapter 11 reorganization proceeding on March 9, 1989, Eastern reduced and eventually stopped making contributions on behalf of its pilots. Moreover, between 1986 and 1990, the amount of lump-sum payments paid to retiring pilots dramatically increased; fewer than twenty-five pilots selected another benefit option after the lump-sum option became available in 1983. In 1986, roughly $52,000,000 was disbursed in lump-sum payments; that number grew to more than $200,000,000 in 1990.[65] Between January 1 and January 18, 1991, already $38,000,000 had been disbursed as lump-sum payments.[66]

This paucity of liquid assets was further exacerbated by the depressed performance of the Plan's substantial real estate holdings. Former Citicorp president William Spencer, a member of the TAC during the period in question, stated at trial that "[t]he real estate which comprised a sizable part of the fund was in a funk, and ... unless some time was developed [so the real estate] could evolve, the hardships on all of the [Plan's] members would be very extreme." Another former TAC member, former President Ford, stated in his deposition that the Plan could not have made lump-sum payments to all retiring pilots without subjecting its real estate holdings to a "fire sale" at prices far below market value. Both former TAC members agreed that holding a fire sale of such potentially valuable assets would have been grossly imprudent. Hunt did not dispute the validity of this testimony.

Second, the terms of the Plan make clear that the administrator owes an equal fiduciary duty to all Plan participants, including annuitants and those who have not elected any benefit option. The

---

[65]The following amounts were distributed in lump-sum payments between 1986 and 1990: $52,091,000 (1986); $79,389,000 (1987); $107,954,000 (1988); $181,856,000 (1989); and $200,540,000 (1990).

[66]At this rate, more than $60,000,000 would have been disbursed in lump-sum payments in January 1991 alone.

administrator is required to treat all participants equally at all times in running the Plan. *See* § 2.2(a) ("[T]he Administrator ... shall have those powers necessary to carry out the day to day operation of the Plan ... and initially determine all questions arising from the administration, interpretation, and application of the Plan ... *provided that each Participant shall be granted the same treatment under similar conditions*.") (emphasis added). Moreover, as named fiduciary, the TAC bears a heavy obligation to ALPA. *See supra* part III.B (discussion of TAC's obligations to ALPA under §§ 2.7(b), 2.8., and 2.11).

Hunt was one of approximately 2,500 pilots who were affected by Eastern's shutdown and the moratorium. Like the hundreds of other Eastern pilots who failed to submit their benefit applications by the close of business on January 18, 1991, Hunt was unable to take advantage of the original lump-sum option that was in effect prior to Eastern's shutdown.

If the Plan administrator were to grant Hunt's lump-sum benefit application, however, it would be arbitrarily favoring Hunt over all of the other pilots who, like Hunt, did not submit their application before the imposition of the moratorium. As a fiduciary under ERISA, the administrator owes a responsibility to administer the plan "in accordance with the documents and instruments governing the plan." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). The Plan plainly states that the administrator is required to discharge its duties in a manner ensuring that "each Participant shall be granted *the same treatment under similar conditions*." *See* § 2.2 ("Administration") (emphasis added). Given this fiduciary responsibility, the administrator, when faced with Hunt's benefit application, made the reasonable decision to treat Hunt exactly like all of the other pilots in his position—that is, to deny his lump-sum benefit despite its "approval" by Eastern's Pension Administration Department. Therefore, even assuming *arguendo* that the TAC functioned as *de facto* administrator, we would find that its "denial" of Hunt's lump-sum benefit was reasonable based upon the facts known by it at that time.[67] Accordingly, in this hypothetical case, the TAC's "denial"

---

[67]As indicated above, we have managed to locate ample information in the record to justify under the arbitrary and capricious standard of review the imposition of the moratorium. We would agree, however, with the district court's assessment that the TAC presented its supporting evidence at trial in a wholly incoherent manner: "[B]ecause the [TAC's data was] either incomplete or not adequately explained, this court was left to wonder what the numbers and

of Hunt's lump-sum benefits would pass muster under the arbitrary and capricious standard of review.[68]

IV.

Hunt cross-appeals the district court's refusal to impose a statutory penalty on the TAC for its alleged failure to comply with Hunt's requests for information.[69] Under section 502(c) of ERISA, an administrator who "fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish to a participant or beneficiary ... within 30 days after such request may ... be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal." 29 U.S.C. § 1132(c).[70] ERISA requires the administrator to provide participants with, *inter alia,* the latest updated summary plan description, the latest annual report, a statement to each participant indicating the total benefits accrued, and "other instruments under which the plan is established or operated."[71] *See* ERISA §§ 104(b)(4), 105(a)(1), 29 U.S.C. §§ 1024(b)(4), 1025(a)(1). The imposition of this penalty is committed to the district court's discretion. ERISA § 502(c), 29 U.S.C. § 1132(c).

---

figures really meant."

[68]Although Hunt is not entitled to receive the total value of his accrued benefit in one full lump-sum payment, we assume that he remains eligible to elect the modified lump-sum option available under Document 91C like all other similarly situated Eastern pilots affected by the shutdown and moratorium.

[69]As stated in part II.A, *supra,* Hunt dispatched four letters allegedly in response to Eastern's February 4, 1991, letter to all Eastern pilots. His March 15, 1991, letter to Dyer of Hawthorne inquired about the status of his pension. His March 20, 1991, letter to O'Connor requested the most current statement of his account and the most recent financial statement for the Plan "showing [its] assets and liabilities." His July 15, 1991, letter to Dyer requested a statement of "the TAC's position on his application," copies of all amendments to the Plan affecting his benefits, an explanation if the TAC were to deny his application, and the name, address, and the forms necessary to file a claim with the Pension Dispute Board if the TAC decided not to pay his lump-sum benefit. This letter also was sent to the then-chairman of the TAC. His August 19, 1991, letter to O'Connor requested copies of the "amendments to the [Plan]," an explanation of whether the TAC "had the right to amend the [Plan]," and a statement disclosing the number of applications for lump-sum benefits filed since January 18, 1991.

[70]Section 502(a)(1)(A) of ERISA empowers participants and beneficiaries to sue "for the relief provided for in subsection(c) of [section 502]." 29 U.S.C. 1132(a)(1)(A).

[71]In the alternative, the TAC argued that Hunt did not request information that ERISA requires an administrator to provide. Like the district court, we make no ruling on this issue.

The issue in this cross-appeal is whether the TAC should be considered an "administrator" for purposes of section 502(c) of ERISA. The previous discussion shows that the Plan designated Eastern as Plan administrator, whereas the TAC served as named fiduciary and as administrator of only the periodic-payment and loan options.[72] Hunt contends, however, that the TAC functioned as *de facto* administrator and thus should be held liable for failing to respond to his requests for information.

Hunt bases his claim on *Law v. Ernst & Young,* 956 F.2d 364 (1st Cir.1992), and *Rosen v. TRW, Inc.,* 979 F.2d 191 (11th Cir.1992), in which we endorsed the analysis set forth in *Law.*[73] In *Law,* an ERISA-plan participant sued his former employer for failing to provide requested information about his benefits in a timely fashion; the plan documents in that case did not designate the former employer as administrator. After reviewing the plan documents in question, the First Circuit held that if the company "acted as the plan administrator in respect to dissemination of information concerning plan benefits, it may be properly treated as such for purposes of the liability provided under [section 502(c) ]." *Law,* 956 F.2d at 373; *see also Rosen,* 979 F.2d at 193-94 ("We agree with the reasoning of the First Circuit and we hold that if a company is administrating the plan, then it can be held liable for ERISA violations, regardless of the provisions of the plan document.") The *Law* court further reasoned that to refrain from imposing liability on such an entity simply because it is not named as plan administrator "would cut off the remedy Congress intended to create." *Law,* 956 F.2d at 373. Finding "a plethora of evidence" showing that the company had "controlled the provision of information," *id.* at 372, 373, the First Circuit affirmed the lower court's judgment for the statutory penalty. *Id.* at 374. In reaching this conclusion, the court emphasized two facts in particular: (1) that the company, according to the plan documents, still exercised considerable control over plan administration; and (2) that the plaintiff's requests for information

[72]*See supra* parts I.D and III.C. We note again that our discussion in part III.C merely assumes for the sake of argument that the TAC served as Plan administrator. Of course, neither the Plan nor the record provides a legitimate basis for making that assumption.

[73]Other circuits have concluded that, for the statutory penalty to apply, the administrator must be the entity so designated in the plan documents. *See Jones v. UOP,* 16 F.3d 141, 144-45 (7th Cir.1994); *McKinsey v. Sentry Ins.,* 986 F.2d 401, 404-05 (10th Cir.1993).

were eventually answered by company employees on company stationery. *Id.* at 373-74.

Although Hunt states in his brief that "Eastern had delegated, and TAC had assumed, the role of Plan Administrator," the record demonstrates that this statement is patently inaccurate. First, as discussed in parts I.D and III.C, *supra,* the record makes clear that with the exception of the periodic-payment and loan options, which were added effective June 25, 1991,[74] Eastern retained its authority as administrator of the Plan at all relevant times. In fact, a July 1991 letter sent from the TAC to all plan participants regarding the periodic-payment and loan options makes this fact unambiguously clear: "The [Plan's] Trust Administrative Committee is designated as Administrator of both of these new [Plan] provisions only. As in the past, Eastern retains administrative authority over all other provisions of the [Plan]."[75] Consequently, Eastern retained its responsibility under the Plan to provide information such as plan summaries and annual statements to all participants. *See* §§ 2.5, 2.6.

Second, Hunt's claim fails because he misinterprets Eastern's simple instructions to all participants in its February 4, 1991, letter. Hunt argues in his brief that this letter, which was sent by Eastern and printed on Eastern stationery, indicated that the "TAC was the authority designated by the Plan Administrator for dissemination of information regarding the [Plan]." This short letter, however, stated that "[q]uestions *regarding the temporary moratorium* should be addressed to the [TAC]" (emphasis added); it made no representation that the TAC was now responsible for providing plan summaries, annual statements, amendments, and other such information to participants.[76] Furthermore, with the exception of the TAC's responsibilities as administrator of the

---

[74]Hunt did not participate in either the periodic-payment or loan option, so this issue is not germane to his claim.

[75]This letter was sent pursuant to the TAC's authority under § 10.2(c) "[t]o furnish to ... Participants such reports with respect to the functions, actions, and decisions of the [TAC] as are reasonable and appropriate."

[76]Hunt's arguments on this claim reveal a profound misunderstanding about basic aspects of the Plan. For example, he contends that the "TAC further held themselves out to be the Plan Administrator by claiming to be negotiating for, and selecting, an administrative services provider." The Plan, however, charges the TAC, as named fiduciary, with the responsibility for selecting investment advisors and other administrative service personnel, provided that the TAC obtains ALPA's consent. *See* §§ 2.9, 2.13(c),(d).

periodic-payment and loan options, the record is devoid of evidence showing that the TAC had assumed any of Eastern's duties regarding the provision of information to participants. We therefore hold that Hunt has failed to support his contention that the TAC functioned as *de facto* Plan administrator and that the district court properly declined to impose a penalty on the TAC pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c).

V.

In light of the above, we REVERSE the judgment of the district court awarding $352,748.74 plus costs to Hunt from the coffers of the Plan's Fund (Counts II and IV).[77] We AFFIRM the decision of the district court to deny Hunt the assessment of a statutory penalty under section 502(c) of ERISA (Count I).

COX, Circuit Judge, concurring in part and dissenting in part.

I dissent from that part of the court's opinion that holds that an action for recovery of benefits under ERISA § 502(a)(1)(B) cannot be maintained solely against an ERISA plan as an entity. I join the remainder of the court's opinion, and, because the holding from which I dissent is an alternative holding, I concur in the result reached by the court.

In my view, ERISA allows an action to recover benefits to be brought solely against an ERISA plan as a entity, with appropriate relief including a money judgment against the plan. The statute clearly states that "[a]n employee benefit plan may sue or be sued under this subchapter as an entity." 29 U.S.C. § 1132(d)(1). The statute then describes the mechanics of suing the plan. *See id.* ("Service of summons, subpoena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan."). And finally, the statute provides that "[a]ny money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity...." 29 U.S.C. § 1132(d)(2). Although in the form of a money judgment, this relief is

---

[77]Although the district court gave Hunt judgment on Count VII, it refused to give him the relief he sought in that count. *See supra* note 48 and accompanying text. Nonetheless, for completeness, we reverse the court's judgment on Count VII as well as the court's judgment on Counts II and IV.

equitable relief. *See Calamia v. Spivey,* 632 F.2d 1235, 1236-37 (5th Cir. Unit A 1980). In *Calamia,* the court explained that "[s]ince Congress has the power to entrust enforcement of new rights to courts sitting as in equity, the first step in determining the legal or equitable nature of an action such as [a claim for benefits] is to examine the intent of Congress." *Id.* at 1237 (citation omitted). Finding congressional intent to be unclear, the court looked at how similar actions were treated before the merger of law and equity. *See id.* In so doing, the court concluded that—because the application of the arbitrary and capricious standard has traditionally been performed by judges—an action to recover benefits is equitable in nature. *See id. See also Wardle v. Central States, et al.,* 627 F.2d 820, 828-30 (7th Cir.1980).

Although our cases have not squarely addressed the issue, we have allowed actions asserting claims for benefits under ERISA to proceed solely against ERISA plans. *See Springer v. Wal-Mart Associates' Group Health Plan,* 908 F.2d 897 (11th Cir.1990); *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37 (11th Cir.1989). Decisions from other circuits have explicitly held that claimants may sue only their ERISA plan. *See Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1324 (9th Cir.1985) ("ERISA permits suits to recover benefits only against the Plan as an entity ...."); and *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) (quoting *Gelardi* ).

In short, the majority's holding that one seeking to recover benefits under an ERISA plan cannot proceed solely against his plan runs counter to the language of ERISA and is not supported by our prior decisions. We have allowed such actions to proceed against both the plan and the plan administrator, without explicitly addressing the issue of who is the proper defendant. *See Marecek v. BellSouth Telecomm.,* 49 F.3d 702 (11th Cir.1995). We also have allowed such actions to proceed against the administrator alone—again without explicitly addressing the issue. *See Godfrey v. BellSouth Telecomm.,* 89 F.3d 755 (11th Cir.1996); *Kirwan v. Marriott,* 10 F.3d 784 (11th Cir.1994); *Jett v. Blue Cross and Blue Shield of Alabama,* 890 F.2d 1137 (11th Cir.1989). But whether an action for benefits may be maintained solely against the administrator, or against both the plan and the administrator, are not issues presented by this case.